[Civil No. 3150. Filed April 18, 1932.]

[10 Pac. (2d) 371.]

L. C. TREADWAY and MARY P. TREADWAY, His Wife, Appellants, v. WESTERN COTTON OIL AND GINNING COMPANY, a Corporation, and PHOENIX SALES AND INVESTMENT COMPANY, a Corporation, Appellees.

Messrs. Alexander, Silverthorne & Van Spanckeren, for Appellants.

Mr. Charles Woolf, for Appellee Western Cotton Oil and Ginning Company.

No appearance for Appellee Phoenix Sales and Investment Company.

LOCKWOOD, J.—L. C. Treadway and Mary P. Treadway, his wife, hereinafter called plaintiffs, brought suit against the defendants herein, Western Cotton Oil and Ginning Company, a corporation, and Phoenix Sales and Investment Company, a corporation, hereinafter more particularly designated respectively as the oil company and the sales company, to recover the sum of $4,380 alleged by plaintiffs to be due from the defendants as installments on a certain

contract between plaintiffs and the sales company, which was by the latter assigned to the oil company. Apparently the sales company did not defend the action, but a demurrer was interposed to the complaint by the oil company, and sustained, and plaintiffs amended. A second demurrer was interposed to the amended complaint, which was also sustained, and plaintiffs electing to stand on that complaint, judgment was rendered in favor of the defendant oil company, and the matter is before us now for review.

The sole question for our consideration is one of law, involving the construction of two contracts. The facts in the case, as set up in the pleadings, may be stated as follows: Plaintiffs were the owners of a half section of land in Maricopa county. On November 1, 1928, they entered into an agreement with the sales company, the material parts of which read as follows:

"That the first parties agree to sell and the second party agrees to buy all that certain parcel of land situated in the County of Maricopa, State of Arizona, described as follows: The West Half (W½) of Section 11, Township 1 North, Range 2 West of the Gila and Salt River Base and Meridian, for the sum of Forty Thousand Dollars ($40,000.00) payable as follows:

"$1200.00 November 5th, 1928; $2000.00 April 1st, 1929; $2800.00 January 22nd, 1930; and $2000.00 on the 2nd day of January of each following year, until the full purchase price of $40,000.00 is paid hereunder.

"It is understood and agreed that second party shall pay interest on all deferred payments hereunder at the rate of seven per cent (7%) per annum, payable annually on the second day of January of each year. . . .

"It is understood and agreed that the first parties are to execute a good and sufficient warranty deed conveying said property to second party, as of this date, and second party is to execute a quit-claim deed of this date conveying said property to first parties, said deeds to be placed in escrow with the Arizona

Title Guarantee and Trust Company, where all payments provided herein shall be made by second party.

"Upon failure on the part of second party to perform promptly all acts required of it herein, including the payment of all sums of money due hereunder, and the payment of all taxes and assessments required by it to be paid by the terms of this agreement, said quitclaim deed and warranty deed is to be delivered to first parties by said Arizona Title Guarantee and Trust Company.

"Upon payment of one-half of the purchase price under the terms of this agreement by second party, said Arizona Title Guarantee and Trust Company is to deliver said quit-claim deed and warranty deed to the party of the second part, at which time second party agrees to execute promissory notes representing the balance of the purchase price then due hereunder, together with a mortgage upon the property sold, securing the payment of said notes by it, and deliver same to first parties. . . .

"Second party agrees to enter upon said premises immediately and farm same in a good and husbandlike manner during the life of this agreement, and to allow no noxious weeds or Johnson grass to mature on the premises.

"Time is the essence of this agreement, and the terms hereof are to extend to and bind the heirs, executors, administrators, and assigns of the respective parties hereto."

Upon the execution of said contract the sales company took possession of the premises.

On February 19, 1929, being heavily indebted to the oil company, it entered into an agreement with the latter, the material parts of which read as follows:

"Phoenix, Arizona,
"Feb. 18th, 1929.

"Western Cotton Oil Company,
"Phoenix, Arizona.

"In confirmation of the understanding between us in connection with our note and the chattel mortgage securing the same, executed to you under date hereof, and to complete and carry out our agreement in that

connection, we hereby assign to you as additional security for the payment of the indebtedness and obligations mentioned in said chattel mortgage, all our right, title, claim and interest in, to and under the following:

"First. That certain 'Agreement for the Sale of Real Estate,' dated November 1st, 1928, and made by L. C. Treadway and Mary E. Treadway, husband and wife, to us (Phoenix Sales and Investment Co.), wherein the said Treadway and wife have agreed to sell and convey to us the West Half (W½) of Section Eleven (11), Township One (1) North, Range Two (2) West, Gila & Salt River Base & Meridian, Maricopa County, Arizona. . . .

"You are to finance the growing of cotton crops on each of the three above mentioned tracts of land during the year 1929. . . .

"There are certain payments to be made during the year 1929 on the two land purchase contracts above mentioned and hereby assigned. Each and all of these payments you are hereby authorized to make for our account.

"You are further authorized to pay for our account any and all money that you shall find necessary to pay out in connection with the farming operations on the three above mentioned tracts of land for the year 1929 and the growing, gathering, processing, protection and sale of the crops that may be produced thereon during that year. . . .

"Our note to you for Twenty Six Thousand ($26,000.00) Dollars, mentioned in and secured by our said chattel mortgage of even date, is intended to include and cover all advances which it is expected you will find necessary to make in connection with the farming operations of said three tracts of land, the payments necessary to be made under said purchase contracts. . . .

"You are to receive all of the crops and products that may be grown on each of the three parcels of land above mentioned during the year 1929 as well as all proceeds from said crops and products, which proceeds when received by you are to be applied, first, on the payment of said Twenty Six Thousand ($26,000.00) Dollar note with the interest thereon and

if any balance of said proceeds remains after the full payment of principal and interest of said note, you are to apply the same on any other indebtedness which we then owe you, including our said indebtedness formerly owed to Western Credit Corporation but which you have now taken over. . . .

"You have the option and privilege of continuing to finance cotton growing and farming operations on the two tracts of land covered by the sales or purchase agreements above mentioned and hereby assigned, during the years 1930 and 1931, by paying such amounts as may be necessary to pay for taxes and for water for irrigation of said land and the amounts necessary to be paid on account of installments of the purchase price of said two tracts in accordance with the terms of said purchase agreement.

"It is understood and agreed, however, that if we should sell all or any part of either of said tracts or the whole of both of said tracts during any one of the three years, 1929, 1930 and 1931, then the tract or portion of tract so sold shall be eliminated from this contract. . . .

"We further understand that after the application on said indebtedness of the proceeds from the 1929 crops above mentioned, together with any proceeds from land sales as hereinbefore mentioned, we are to pay the balance of said indebtedness as follows:

"Not less than Ten Thousand ($10,000.00) Dollars of the principal of said balance on or before January 1st, 1931, together with the interest accrued and unpaid on the entire amount of said balance to that date and the remainder of said indebtedness, with the interest thereon, we are to pay on or before January 1st, 1932. . . .

"It is understood that if and when we fully pay all our indebtedness to you, agreeable to the terms mentioned in the next paragraph hereof, then and in such event, but not otherwise, you will release or re-assign to us the two sale contracts or agreements hereinbefore mentioned and deed to us the sixty-three acres of Garrison land or such part thereof, if any, as may not have previously been sold as herein stipulated.

"Should you, during the years 1930 and 1931, or either of said years, continue to finance the growing of crops on all or any part of the land hereinbefore mentioned, then you are to receive all of said crops and the products and the proceeds thereof and shall have the absolute right to apply said proceeds when received by you on any indebtedness which we may then owe you. . . . "

The oil company thereupon went into possession of the property involved, and farmed it for the years 1929 and 1930, and was still in possession in the spring of 1931, having paid to plaintiffs all sums becoming due under the contract of sale above set forth, up to the installment due January 2, 1931. This last installment it refused to pay, and therefore this suit was brought.

It is the contention of defendants that the complaint was fatally defective for two reasons, which we shall consider. The first is that the original agreement between plaintiffs and the sales company herein set forth was not an absolute one of purchase and sale, of which specific performance could be enforced, but was in effect an option which the sales company or its assignee might abandon at any time without any other liability than loss of the amount already paid thereunder.

It will be observed that in the first part of the contract the "first parties agree to sell and the second party agrees to buy" the property involved. This language, standing alone, unquestionably does not constitute a mere option on the part of the second party, which might be abandoned by it at will, but a mutual, bilateral agreement of sale, definite and binding, so that either party, in case of a breach by the other, might insist on specific performance. *Chenoweth* v. *Butterfield*, 11 Ariz. 315, 94 Pac. 1131; *Dillinger* v. *Ogden*, 244 Pa. 20, Ann. Cas. 1915C 533, 90 Atl. 446. It is claimed, however, that there are other

clauses in the contract which show the intention of the parties to be that it was an option.

It is the ordinary rule of law that a provision in a contract for the sale of real estate to the effect that on default it shall be void, and the purchaser's right forfeited, is for the exclusive benefit of the vendor, and he is not bound to terminate it, but may enforce specific performance. *Wilcoxson* v. *Stitt,* 65 Cal. 596, 52 Am. Rep. 310, 4 Pac. 629. On the other hand, the parties to a contract may, if they desire, provide therein precisely what the remedy shall be in case of a breach, and if they have so provided, they will be limited in their remedy by the terms of the contract. *Armstrong* v. *Irwin,* 26 Ariz. 1, 32 A. L. R. 609, 221 Pac. 222.

The contract in *Armstrong* v. *Irwin, supra,* although it contained the language of purchase and sale just above quoted from the present contract, also had the following clause:

"In the event that the second parties shall default in the payment of any sum of principal or interest at the times herein mentioned, and such default shall continue for a period of fifteen days after written notice thereof, then and in that event the second parties shall lose all rights under this contract and the first parties shall not be obligated either in law or equity to convey said premises to the second parties and the second parties shall forfeit to the first parties all moneys that shall have been paid on account of this contract as liquidated damages and as compensation for the use and occupation of said premises."

It will be seen that therein there is a specific statement that in case of default the purchaser should lose all rights under the contract, and should forfeit to the sellers all money that had been paid on account of the contract as liquidated damages and compensation for the use and occupation of the premises, and we held that such a contract was more in the nature of a

lease with option to purchase than an absolute contract of purchase and sale, and that the vendor could not enforce the contract specifically, but was limited to the remedy he had himself stipulated.

It will be noted, however, in the contract involved herein, that not only is there no provision in regard to liquidated damages or compensation for the use and occupation of the premises, but not even one that the contract shall be void in case of default. The only reference to what shall be done under such circumstances is that the deeds which are placed in escrow for delivery to the purchaser under certain conditions shall be returned to the vendor. If a provision that the contract shall be void on default of the vendee can be taken advantage of only by the vendor, we are of the opinion that the provision in regard to the return of the deeds, which does not necessarily imply that the contract shall be terminated, should also be construed as effective only at the option of the vendor. Were it not so, a vendee who desired to get out of a bad bargain might refuse to make his payments, and thus take advantage of his own wrong.

But it is said that the clause in the contract, ''Second party agrees to enter upon said premises immediately and farm same in a good and husband-like manner during the life of this agreement, and to allow no noxious weeds or Johnson grass to mature on the premises,'' shows that it was not the intention of the parties that the contract should be a binding one of sale, for if it were the vendor would have no interest in what was done with the premises, and we are cited to the case of *Rose* v. *Garn,* 56 Utah 533, 191 Pac. 645, wherein the court says:

''In the light of human affairs generally, and particularly in the dealings of men in the ordinary business transactions of life, it would be extremely difficult to conceive of the vendor of real property direct-

ing the purchaser as to when, or what use or disposition is to be made of it, more especially in the way of plowing it for crops. We do not think this provision of the contract would have been written had the parties contemplated that an absolute purchase and sale of the property was being made by the transaction between them.''

That court, however, also points out the contract contained no express words constituting a contract of sale, and further that it provided in case of breach ''said deed . . . shall become null and void and all sums of money theretofore paid by the grantee shall be forfeited to the grantors as liquidated damages,'' and expressly based its decision on such facts, using the provision regarding cultivation only as additional evidence of the intent of the parties.

The contract in issue here has in it the express words of purchase and sale lacking in *Rose* v. *Garn, supra,* and lacks the provision for liquidated damages. And it seems to us but natural that a vendor who had executed a contract of sale and not an option, but who had not received the full purchase price for his property, and who realized that it might not be practicable, due to the insolvency of the purchaser or the cost of prolonged litigation, to enforce specific performance, so that his only effective remedy in case of default would be to retake the premises, should stipulate that they be kept in good condition during the term the contract was being paid out. Provisions of this kind, which are in effect covenants against waste, are far from being uncommon in mortgages taken back for a portion of the purchase price when a deed absolute is given in advance.

We are of the opinion that the contract in question is one of purchase and sale, rather than an option of purchase, and that the rule laid down in *Armstrong* v. *Irwin, supra,* does not apply, but rather the principles set forth in *Wilcoxson* v. *Stitt, supra,* and the

cases which follow it, to the effect that a provision for an avoidance of a contract in case of a default by the vendee is effective only at the will of the vendor.

The second proposition is a more serious one. While we are of the opinion, as we have stated, that the contract was one of absolute purchase and sale, and not a mere option, and plaintiffs might sue the sales company for specific performance thereof, it does not necessarily follow that they had any remedy against the oil company. It is well settled that the acceptance of an assignment of a contract like this in no manner binds the assignee to assume the obligations set forth in the contract. Of course he cannot compel the vendor to specific performance without performing the obligation imposed on the vendee, but he may, if he desires, at any time decline to carry out such obligations and leave the matter for appropriate action between the original parties. This, indeed, is not disputed as a general principle by plaintiffs, but they contend that an assignee may by assumption of the obligations of the vendee bind himself to perform the terms of the contract. The rule, with its qualifications, is set forth in the case of *Lisenby* v. *Newton,* 120 Cal. 571, 65 Am. St. Rep. 203, 52 Pac. 813, as follows:

"Plaintiff contends on appeal that Sharples was personally responsible for the purchase money and interest. Of course, no assignee of the purchaser in an executory contract for the sale of real estate can require the vendor to convey unless the purchase money be paid, but this conditional right to a conveyance is quite a different thing from personal liability to compulsory payment at the suit of the vendor. *Such liability can result only from some express or implied contract of the assignee, and is not implied from the mere assignment of the original contract, although followed by possession of the land."* (Italics ours.)

See, also, *Langel* v. *Betz,* 250 N. Y. 159, 164 N. E. 890; 39 Cyc. 1671.

This is true even if the assignment had been intended to convey the whole interest of the vendee to the assignee, and much more is it so when, as in this case, it is given solely as security for a debt, and is in effect an equitable mortgage. We think no case can be found holding that the taking of an equitable mortgage on an executory contract is of itself an assumption by the mortgagee of the payments required by the contract. Indeed, plaintiffs practically concede they would have no claim against the oil company had the latter not taken possession of and farmed the land by virtue of the assignment in the year 1931. It is apparently their position that such action was an assumption of the payment of the installment due January 2, 1931, with accrued interest under the following clause of the assignment:

"You have the option and privilege of continuing to finance cotton growing and farming operations on the two tracts of land covered by the sales or purchase agreements above mentioned and hereby assigned, during the years 1930 and 1931, by paying such amounts as may be necessary to pay for taxes and for water for irrigation of said land *and the amounts necessary to be paid on account of installments of the purchase price* of said two tracts *in accordance with the terms of said purchase agreement."* (Italics ours.)

We are of the opinion that as between the oil company and the sales company, such clause, if standing alone, would imply an assumption of the payment of the installment due January 2, 1931, under the circumstances set up in the complaint, and that on default of payment the sales company could have recovered it from the oil company. But contracts must be construed as a whole, and a succeeding clause greatly changes the situation. By it the sales com-

pany agreed to pay not less than $10,000 on its indebtedness to the oil company, together with accrued interest, before January 2, 1931. So the oil company could have counterclaimed against the sales company, in case of suit by the latter to recover the defaulted installment, for any unpaid portion of the ten thousand dollars and interest, and in any event plaintiffs could have no greater rights against the oil company than did the sales company. *Malanaphy* v. *Fuller & Johnson Mfg. Co.*, 125 Iowa 719, 106 Am. St. Rep. 332, 101 N. W. 640; *Clark & Co.* v. *Nelson,* 216 Ala. 199, 53 A. L. R. 173, 112 South. 819. But had they the right to maintain any suit whatever against the oil company?

Undoubtedly the latter had not contracted with them to pay the installment, and as a general rule only the parties and privies to a contract may enforce it. *Second National Bank of St. Louis* v. *Grand Lodge, etc.*, 98 U. S. 123, 25 L. Ed. 75. There is, however, an exception to this rule in many jurisdictions, which is stated in the case of *Steward* v. *Sirrine,* 34 Ariz. 49, 267 Pac. 598, by this court as follows:

"We think it is the well-settled rule of law that where one person agrees with another, on a sufficient consideration, to do a thing for the benefit of a third person, the third person may enforce the agreement, and it is not necessary that any consideration move from the latter. It is enough if there is a sufficient consideration between the parties who make the agreement."

If, then, the assignment and agreement to pay the installment due January 2, 1931, were made for the benefit of plaintiffs, they may maintain this suit under the authority of *Steward* v. *Sirrine, supra.*

We think the facts in that case show a situation entirely different from those in the case at bar. There Steward purchased outright the entire interest of the original vendee, and agreed without qualification to

make all the payments due Sirrine from the vendee. In effect, he agreed to step into the shoes of the latter. As between Sirrine and the vendee, the payments made by the latter were for the benefit of the former, and Steward having merely substituted himself in all respects for the vendee, is subject to all of his liabilities.

In the case at bar there was no substitution. The original vendee was still the beneficiary under the contract. It had the right to sell the land at will, releasing it from the assignment, and on payment of its debt to the oil company, possession of the entire premises was to be returned to it. The agreement to pay the installments was in no manner intended for the benefit of plaintiffs, but was an advance to pay a debt of the sales company, made for the purpose of protecting the security of the oil company. True, it did incidentally benefit plaintiffs, but such *incidental* benefit will not support the action. The benefit contemplated by the rule must be intentional and direct. *Constable* v. *National Steamship Co.*, 154 U. S. 51, 38 L. Ed. 903, 14 Sup. Ct. Rep. 1062; *Pennsylvania Steel Co.* v. *New York City R. Co.*, (C. C. A.) 198 Fed. 721; 6 R. C. L. 886, 887.

But plaintiffs say the rule also applies when assets to which they were entitled in equity were held by the oil company. *Second National Bank of St. Louis* v. *Grand Lodge, supra.* And it is contended that the right of possession of the premises is the asset belonging to them which that company had. Admitting the correctness of the rule in the abstract, the facts do not justify its application. By the terms of the original contract possession of the premises passed to the sales company, and plaintiffs are not entitled to such possession *so long as the contract remains in force.* If, on the one hand, they claim the possession, they have by such claim repudiated the contract, and

their suit for installments thereon necessarily falls. If, on the other hand, they stand on the contract and the right to sue for the purchase price, they are not entitled to possession of the land. They cannot keep their cake and eat it also.

We think what we have said disposes of the issues raised by the pleadings and briefs.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.