Del E. Webb Development Co. v. Commissioner.
Del E. Webb Development Co. v. Commissioner
Docket No. 4433-67
United States Tax Court
T.C. Memo 1970-154; 1970 Tax Ct. Memo LEXIS 205; 29 T.C.M. (CCH) 661; T.C.M. (RIA) 70154; June 15, 1970, Filed Mark Townsend, 24th Floor, 606 South Olive St., Los Angeles, Calif., for the petitioner. Myron A. Weiss and Allan D. Teplinsky, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the taxable year ended November 30, 1960, in the amount of $162,399.83; for the taxable period December 1 to December 31, 1960, in the amount of $11,050.24; and for the calendar year 1961 in the amount of $121,522.70. Petitioner's taxable year ended November 30, 1959, is also in dispute because of a disallowed net operating loss deduction arising in that year and carried forward to the year ended November 30, 1960. By amendment to its petition, petitioner is claiming an overpayment of $29,494 for the taxable year 1961. The only issue *206 remaining for our decision is whether petitioner acquired certain depreciable assets in 1959 and thereby became entitled to depreciate them in 1959 and subsequent years. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner is a corporation organized and existing under the laws of the State of Arizona. Its principal office is in the city of Phoenix, Arizona. Petitioner filed Federal corporate income tax returns for the periods here involved with the district director of internal revenue at Phoenix, Arizona. All of the issued and outstanding shares of petitioner, consisting of 30 shares of common capital stock, par value $100, were acquired by the Del E. Webb Corporation ("parent company"), an Arizona corporation formerly known as the Del E. Webb Construction Co., on April 13, 1959. On December 31, 1959, the parent company sold 14.7 shares of petitioner's stock to the J.G. Boswell Company ("Boswell"), an Arizona corporation. The ownership by the parent company of 15.3 shares and by Boswell of 14.7 shares of petitioner's issued and outstanding capital stock has remained the same from December 31, 1959, to the present. On April 14, 1959, petitioner *207 and Boswell entered into an agreement which recited that on or before July 31, 1959, the parties would enter into a further purchase and trust agreement whereby petitioner would purchase from Boswell the Marinette and Santa Fe ranches, located in Maricopa County, Arizona, together with the 662 buildings, improvements, and appurtenances thereon. The Marinette and Santa Fe ranches consisted of approximately 10,000 acres and 10,400 acres, respectively. The ranches were physically separated by approximately six miles, with the closer ranch, the Marinette, located approximately twelve miles from the city of Phoenix. On July 17, 1959, petitioner and Boswell did enter into the further agreement provided for by the agreement of April 14, 1959, including as a party the Arizona Title Guarantee & Trust Company, now the Arizona Title Insurance & Trust Company ("Title Company"), as trustee. The July 17, 1959, agreement ("trust agreement"), in the form of a subdivision trust, named, besides Title Company, as trustee, petitioner, as trustor, and Boswell, as beneficiary. The trust agreement included the following provisions: I. Beneficiary agrees to sell and does hereby sell to Trustor the *208 property for the full sum of Fifteen Million Dollars ($15,000,000.00), payable at the time and in the manner hereinafter set forth, and Trustor hereby agrees to and does hereby purchase said property from Beneficiary for said sum, payable at said time and in said manner. II. Trustor hereby assigns and conveys to the Trustee all of the real property described in Schedule I, (excluding all crops now growing thereon.) It is mutually understood and agreed that title to the property together with all of the proceeds from the sale hereof to Trustor and all monies that may be paid to the Trustee under the provisions hereof, shall constitute and be designated the "Trust Estate". It is mutually agreed that throughout the term of this Agreement and the duration of the Trust hereby created, the legal title to said property shall be vested in the Trustee, except as hereinafter provided, and that no legal interest in and to said property shall be vested in either Beneficiary or Trustor, and that the rights of said Beneficiary and Trustor hereunder are personal, consisting only of the right to enforce performance on the terms and conditions hereof by the other parties hereto. This Agreement, and *209 the rights hereunder, shall not be assignable for any purpose by either Beneficiary or Trustor. III. The purchase price to be paid hereunder shall be paid to the Trustee for the account of Beneficiary as follows: (a) One Million Dollars ($1,000,000.00) or more, on or before five (5) years from the date hereinabove first written. (b) An additional Four Million Dollars ($4,000,000.00) or more, on or before ten (10) years from the date hereinabove first written. (c) An additional Five Million Dollars ($5,000,000.00) or more, on or before fifteen (15) years from the date hereinabove first written. (d) An additional Five Million Dollars ($5,000,000.00) or more, on or before twenty (20) years from the date hereinabove first written. No interest shall be payable with respect to any portion of the unpaid balance of the purchase price, provided, however, that all payments of Release Price as hereinafter set forth shall be credited to unpaid balance when and as received. IV. Trustor agrees that it will pay all taxes, assessments, special assessments including, but not limited to water district assessments, and all other impositions of every kind and nature, which may be levied, *210 assessed or imposed upon the premises or any part thereof, or on any buildings or improvements situated thereon. Such payments shall be paid as they become due. * * * V. It is understood and agreed that Trustee shall lease the property to Beneficiary by lease of even date for the purpose of conducting a farming operation thereon for a term of twenty (20) years commencing upon the date of execution of this Agreement, subject to the right of Trustor to request release of parcels of the property from said lease and the Trust upon payment of installments of the purchase price as hereinafter set forth. * * * Beneficiary shall have the right, at its option, to terminate all or any part of the Lease upon six (6) months' written notice to Trustor. * * * VIII. * * * The parties agree that Trustor shall have the right to designate any parcel of the property for release, provided that such parcel shall contain not less than fifty (50) acres in any one section * * * and, provided further, that Trustor shall give Beneficiary and Trustee reasonable written notice of its intent to cause such parcel to be released. Three (3) to fifteen (15) months shall be considered reasonable written notice, *211 depending upon the nature of the crop then being grown upon such parcel. It is understood and agreed that the installments of the purchase price to be paid by Trustor to the Trustee pursuant to Paragraph III shall entitle Trustor to the release of acreage in accordance with this Paragraph VIII. * * * 663 IX. It is mutually understood and agreed that Trustor shall not be liable for any real estate or brokerage commission resulting from or arising within the sale of said property. Beneficiary agrees to deposit with Trustee within sixty (60) days from the date hereof a boundary survery of the property prepared by a registered civil engineer. Beneficiary shall procure an ATA extended Coverage Owner's Title Insurance Policy issued by Arizona Title Guarantee & Trust Company insuring Trustor in the full amount of the purchase price, free and clear of all liens and encumbrances except those shown as exceptions on that certain Preliminary Title Report No. 183869 of Arizona Title Guarantee & Trust Company, Phoenix, Arizona. Beneficiary shall pay for the cost of such boundary survey and Title Insurance Policy, not to exceed Twenty-Five Thouand Dollars ($25,000.00). Trustor shall pay *212 for any of said cost in excess of Twenty-Five Thousand Dollars ($25,000.00). Beneficiary agrees to pay for the Internal Revenue stamps to be affixed to the deeds conveying said property to the Trustee. * * * XII. In the event Trustor shall default upon the payment of the purchase price due pursuant to Paragraph III, and such default shall remain uncorrected for a period of thirty (30) days after receipt of notice in writing from Trustee, then Beneficiary shall have the option to enforce a cancellation and forfeiture of the interest of Trustor hereunder. Cancellation and forfeiture may be made in the following manner: By serving upon Trustor and Trustee a written declaration of cancellation and forfeiture, or by depositing in the United States mail, postage prepaid, by registered mail, such written declaration of cancellation and forfeiture addressed to Trustor at Post Office Box 4066, Phoenix, Arizona, or at such other post office address as Trustor shall have filed with the Trustee, and to Trustee at 124 North First Avenue, Phoenix, Arizona. Upon such declaration of cancellation and forfeiture being made by Beneficiary as provided herein, all rights, estates and interests *213 hereby created or then existing in favor of Trustor or anyone who claims under it in and to all portions of the property not released to Trustor prior thereto, shall cease, terminate and become null and void, and all equitable and legal interests and estates in all such unreleased portions of the property, together with all sums of money theretofore paid by Trustor hereunder, shall revert to, be vested in, and become the sole property of the Trustee for the benefit of Beneficiary, free and clear of any right, title, lien or claim of Trustor, and Trustor shall have no right, either in law or in equity, to reclaim or recover any compensation for monies paid or services performed. Beneficiary's right to retain all sums previously received by it under this Trust and Beneficiary's right to declare such a cancellation and forfeiture and to receive all portions of the property not released to Trustor prior thereto, shall be its sole and exclusive remedy in the event of default on the part of Trustor. In the event of forfeiture of the rights of Trustor, the Trustee shall, upon written demand of Beneficiary, and after payment of all the costs, fees, expenses and advances of the Trustee, deed *214 the remaining trust property or any part thereof to Beneficiary or its nominee, or shall otherwise handle, manage or dispose of said property as it may be directed by Beneficiary. * * * XXIV. It is agreed that the parties in possession from time to time of properties under this Agreement of Trust shall carry adequate public liability and property damage insurance insuring all parties to this Agreement as is required by the other parties. In accordance with the agreements, on July 17, 1959, Title Company, as trustee (and lessor), also entered into a lease with Boswell. The leaseback of the unreleased portions of the property to Boswell for farming reduced petitioner's subsequent residential development costs because such farming prevented the rapid erosion of the land which occurs with respect to untilled acreage in the area of the property. Prior unsuccessful attempts of its parent corporation at farming discouraged petitioner from trying itself to farm the ranches. The lease agreement included provisions that- (a) The term of the lease is 20 years. (b) Lessee is to pay to lessor annual rental equal to the aggregate of all taxes and assessments, including water district expenses, *215 on the unreleased property. (c) Lessee recognizes the unrestricted right of petitioner upon written notice of not less than three months nor more than 15 months to withdraw parcels from the lease at any time in the case of parcels of not less than 50 acres and with the consent of lessee for smaller parcels for purposes such as dedication of streets, and easements. The extent of the advance notice depended upon the type of crops planted on the parcel to be released. 664 (d) Lessee may at any time terminate all or any part of the lease upon six months' written notice. (e) Lessor may terminate the lease and retake possession of the property in the event an assignment is made by lessee for the benefit of its creditors or in the event of the bankruptcy of lessee. The taxes and assessments on the unreleased property, and therefore the amount of the rental, were as follows: Year
Amount
1960
$118,692
1961
89,667
1962
90,114
1963
110,551
1964
126,044
1965
129,834
An appraisal of the property and of the appurtenances and improvements thereon was made as of April 14, 1959. Petitioner claimed a cost basis in the real property and improvements in an *216 amount equal to the purchase price of $15 million and allocated this basis as between the two ranches and the improvements thereon in the same ratio as the values determined by the appraisal. Petitioner proceeded with the development of the property by phased construction of a retirement community known as Sun City. The construction of the retirement community commenced on the Marinette ranch in 1959. On July 22, 1959, Boswell conveyed the property to the trustee by recorded deed. Internal revenue stamps in the amount of $16,500 were affixed to the deed as was required in 1959 upon the transfer of real property. The absence of any provision for interest to be paid upon the unpaid balance of the purchase price was the result of negotiations between petitioner and Boswell, and part of the consideration therefor was the relatively low rental to be charged Boswell under the leaseback of the unreleased portions of the property. The absence of long-term commitments for interest was an important consideration to petitioner for credit and loan purposes and to petitioner's parent corporation for purposes of its consolidated financial reporting. The absence of long-term high rental commitments *217 and the value of the sales contract as an asset on its balance sheet were important considerations to Boswell for credit and loan and financial reporting purposes. Boswell treated the transaction as a completed sale on its books and records and tax returns. Boswell had farmed the property for many years prior to 1959 for cotton, barley, and long-term crops such as asparagus and lettuce. Subsequent to the purchase and sale agreement, Boswell changed the nature of its farming operations by eliminating the long-term crops of asparagus and lettuce. In 1960, petitioner sold to the Arizona Public Service Company electrical distribution facilities consisting of powerlines and transformers. These facilities ran the wells on the Marinette ranch and provided electrical power elsewhere on the property. Most of the facilities at the time of sale were located on unreleased portions of the ranch. Petitioner retained the proceeds of the sale. On the Marinette ranch, petitioner followed a development program which called for the construction of golf courses, community and commercial facilities, a shopping center, motor hotel, and medical center. These facilities were substantially built prior *218 to the actual sale of homes. By the end of 1961, petitioner had cash investments in such facilities totaling approximately $4 million. In 1965 and early 1966 petitioner's parent corporation suffered tremendous financial losses. Desiring to improve the current position of its consolidated balance sheet by reducing long-term indebtdness, the parent corporation approached Boswell and requested the latter to take back the Santa Fe ranch. Boswell at this period in time was being forced out of its farming operations in southern Arizona due to high water costs, lack of water, and problems of productivity on its southern Arizona ranches. It was also being forced off its leased farming land on the Marinette ranch because of petitioner's development of the property. Concurrently, a change in the farm program of the U.S. Government in 1965 created a more favorable climate for cotton production in Arizona. For these reasons Boswell agreed to take back the Santa Fe ranch. It then began to make long-term farming improvements which had not been feasible under the lease. In addition to taking back the Santa Fe ranch, Boswell purchased from petitioner two other ranches adjacent to the Santa Fe ranch *219 which petitioner had previously acquired from third parties. The result of 665 these transactions was to improve considerably the consolidated balance sheet of the parent corporation by eliminating long-term debt. The aforementioned lease of the Santa Fe ranch was also amended to remove the ranch from the lease. The provisions in the lease respecting the annual rent of the unreleased portions of the Marinette ranch were also amended to place a ceiling on the rent, regardless of tax or assessment increase, by providing that beginning with the year of the lease term commencing July 17, 1966, the annual rental per acre may not exceed the per acre rental for the year commencing July 17, 1965. Opinion The sole issue remaining for our decision is the determination of the year in which petitioner acquired certain depreciable assets. The amount of such depreciation deductions is not in contest. On July 17, 1959, petitioner and Boswell entered into an agreement to purchase and sell two ranches consisting of approximately 20,400 acres of real property with buildings, improvements, and appurtenances thereon. The form of the agreement was that of a subdivision trust with the trustee *220 being a title company. The agreement provided that the purchase price of $15 million was to be paid without interest at the rate of $1 million or more on or before five years from the date of the agreement and the remainder of the purchase price payable at five-year intervals during the ensuing 15 years. The agreement provided for release from the trust of parcels of the property designated by petitioner upon remittance of release payments in accordance with a schedule attached to the agreement. Such release payments were credited to the unpaid balance of the purchase price. Respondent's position is that petitioner acquired a depreciable interest in the improvements on the property only at the time the parcels were released by Title Company. Until then, contends respondent, petitioner had simply an option to purchase the unreleased portions of the ranches. Petitioner, of course, insists it became entitled to depreciate the improvements on the ranches at the time it entered into the agreement of July 17, 1959. This Court has long held that depreciation is not predicated upon ownership of property but rather upon an investment in property. Gladding Dry Goods Co., 2 B.T.A. 336 (1925). *221 The Commissioner does not dispute that a person is entitled to depreciate property which he acquires at its fair market value in an arm's-length transaction creating a bona fide purchase and a bona fide debt obligation. Rev. Rul. 69-77, 1969-1 C.B. 59, acquiescing to Manuel D. Mayerson, 47 T.C. 340 (1966). Thus, the pivotal question in the case at bar is whether the aforesaid agreement of July 17, 1959, constituted a bona fide debt obligation and bona fide purchase of both ranches. The agreement provides specifically that Boswell "agrees to sell and does hereby sell" and petitioner "agrees to and does hereby purchase said property." Standing alone, this language is strong evidence that the agreement is a mutual contract of sale binding on both parties rather than a mere option to purchase. Treadway v. Western Cotton Oil & Ginning Co., 40 Ariz. 125, 10 P. 2d 371 (1932). Respondent claims, however, that other clauses in the contract indicate the intention of the parties merely to create an option to purchase rather than a completed sale. Respondent specifically points to the following language: In the event Trustor shall default upon the payment *222 of the purchase price due pursuant to Paragraph III, * * * then Beneficiary shall have the option to enforce a cancellation and forfeiture of the interest of Trustor hereunder. Cancellation and forfeiture may be made in the following manner: Beneficiary's right to retain all sums previously received by it under this Trust and Beneficiary's right to declare such a cancellation and forfeiture and to receive all portions of the property not released to Trustor prior thereto, shall be its sole and exclusive remedy in the event of default on the part of Trustor. Respondent infers from the phrase "sole and exclusive remedy" appearing in the foregoing provision that Boswell's only remedy in the event of default was to declare a cancellation and forfeiture. We construe this phrase, like the rest of the paragraph which follows the colon, to merely set forth the procedures to be followed in the event that Boswell elects not to enforce the contract but rather to declare a cancellation and forfeiture. The aforesaid phrase precludes Boswell from suing for damages as well as cancelling the contract. Cf. Cherry Valley Iron Works v. Florence Iron River Co., 64 F. 569 (1894), in *223 which the Court of Appeals relied upon 666 language of the contract to permit the nonfaulting seller an action for damages as well as cancelling the contract. Respondent's construction of the agreement also fails to give weight to the language that Boswell has "the option to enforce a cancellation and forfeiture." This language strongly indicates that Boswell did not have to cancel the contract in the event of a default by petitioner. Boswell could have elected to hold petitioner to its personal obligation to purchase the ranches. Respondent points to certain facts as indicating that sale of individual parcels did not take place until the parcels were released from the trust. For instance, petitioner incurred no interest liability on the unpaid amounts of the purchase price, and without paying a fixed amount of rent Boswell retained possession of the property until a release occurred. Respondent also points out that in 1966 the parties rescinded the sale of one of the two ranches without petitioner paying any damages or ever having acquired title to it. We do not regard the subsequent event of the rescission as an indication of the parties' original intent merely to create *224 an option. We feel there were substantial business reasons for the rescission and that the rescission was not contemplated by either party prior to 1965. Only after its parent company had suffered tremendous losses in 1965 and early 1966 did petitioner request the rescission. It then became a primary concern of the parent company to remove from its balance sheet as much long-term liability as possible. Boswell, on the other hand, agreed to the rescission because changes in the farm program of the U.S. Government had recently occurred in 1965 which improved the economics of cotton production in Arizona. By taking back the ranch, Boswell could make necessary long-term improvements which were not feasible while the lease was in effect. There were equally sound business reasons behind the leaseback arrangements as to interest and rent. Both petitioner and Boswell desired to abstain from long-term obligations. It was thus to their mutual advantage that petitioner not be obligated for interest payments and in return Boswell not be obligated for rent other than its paying the taxes and special assessments. Boswell's payments of such taxes averaged yearly about $110,000, which was certainly *225 not de minimis. The absence of interest on unpaid balances, moreover, was not an unusual practice in 1959. This practice was then occurring in sufficient frequency to cause the later adoption of the unstated interest provisions of section 483, Internal Revenue Code of 1954. The leaseback of portions of the property to Boswell was also attributable to sound business reasons. First, farming of the unreleased portions reduced petitioner's subsequent residential development costs because farming prevented rapid erosion of the land. Second, since Boswell was already farming the property, it was only logical that it continue to do so. Prior unsuccessful attempts of petitioner's parent corporation at farming discouraged petitioner from trying itself to farm the ranches. We think it further significant that petitioner invested substantial sums in the construction of facilities such as golf courses, a motor hotel, and a shopping center prior to the actual sale of homes. Also significant is the fact that petitioner sold electrical distribution facilities to a utility company and retained the sales proceeds. Most of the facilities sold were located on unreleased portions *226 of land. These facts are significant because they indicate that petitioner did not contemplate backing away from its purchase agreement. We therefore conclude that the agreement of July 17, 1959, created a purchase and debt obligation which gave petitioner the necessary capital investment in the ranches to be entitled to depreciate the improvements thereon as of that date. [1]
In Rev. Rul. 69-77, supra, the Internal Revenue Service states that it will disallow depreciation deductions where purchases of property in the light of all the facts and circumstances appear designed to improperly create or inflate depreciation deductions. Using the Commissioner's own test, 667 we further conclude in light of all the facts and circumstances *227 of the immediate case that the parties herein did not design the purchase agreement of July 17, 1959, to improperly create depreciation deductions. [2]
*228 Decision will be entered under Rule 50. Footnotes
1. The parties herein have discussed at length in their briefs our opinion in Manuel D. Mayerson 47 T.C. 340 (1966), acq. 1969-1 C.B. 21↩. Since we are holding that petitioner was personally obligated under the agreement of July 17, 1959, to purchase both ranches, we need not consider what would otherwise have been the result if petitioner were not personally liable, which was the situation in Mayerson.
2. In his statutory notice of deficiency, respondent took the position that deductions for depreciation claimed by petitioner on the improvements should be disallowed because petitioner acquired such improvements with the intent to remove or demolish them; therefore, the cost basis of such improvements should be allocated solely to the cost of acquiring the underlying land. Petitioner and respondent arrived at a settlement with respect to this issue. The settlement by the parties did not, however, resolve the case because in an amended answer respondent raised a new issue. He took the position that a completed purchase and sale did not occur in 1959. Under these circumstances, respondent must assume the burden of proof in the instant case. Rule 32, Tax Court Rules of Practice; Leon Papineau [Dec. 22,333], 28 T.C. 54, 57↩ (1957). Apparently respondent concedes this point for he did not argue to the contrary either in his opening argument or on brief. In any event, we need not decide this case, however, on the basis of which party has the burden of proof. Looking to where the preponderance of the evidence lies, we feel it lies in petitioner's favor.