762 P.2d 1345

**Circie FRANKO, Plaintiff–Appellant,**

v.

**James M. MITCHELL, Defendant–Appellee.**

**No. 1 CA–CIV 9225.**

Court of Appeals of Arizona, Division 1, Department A.

June 2, 1988.

Petition and Cross–Petition for Review Denied Nov. 8, 1988.*

---

* Feldman, V.C.J., of the Supreme Court, voted to grant review on Issue No. 1.

Pasquale R. Cheche and Paul G. Ulrich, Phoenix, for plaintiff-appellant.

Jennings, Strouss & Salmon by William T. Birmingham, M. Byron Lewis and Geoffrey R. Hamlin, Phoenix, for defendant-appellee.

## OPINION

GREER, Presiding Judge.

Plaintiff Circie Franko brings this appeal from summary judgment entered in favor of defendant James M. Mitchell on Franko's claims for breach of contract for professional legal services and legal malpractice.

## ISSUES

To resolve the appeal, we must determine the following issues: (1) whether there existed genuine issues of material fact concerning the alleged attorney-client relationship between Mitchell and Franko; (2) whether there existed genuine issues of material fact concerning Franko's contention that she was an intended third-party contract beneficiary; (3) whether Franko has a cause of action against Mitchell for legal malpractice; (4) whether Franko's action should be allowed to proceed on a theory of negligent misrepresentation; and (5) whether Franko is eligible for an award of attorney's fees on appeal pursuant to A.R.S. § 12–341.01(A).

## FACTS

Because this is an appeal from summary judgment, the facts will be considered in the light most favorable to appellant Franko. *State ex rel. Corbin v. Challenge, Inc.*, 151 Ariz. 20, 725 P.2d 727 (App. 1986). Franko and Carl Markoff, Sr. (Markoff) were both single persons at all times relevant to this litigation. Franko first met Markoff before 1982. Beginning in April, 1982, Franko and Markoff began seeing each other on a regular basis and formed a very close, intimate relationship.

In the latter part of 1982, Markoff told Franko that he wanted his own business and needed money for a down payment to buy a bar. Markoff and Franko thereafter often discussed Markoff's desire to own his own bar. During that same period, Franko was in the process of selling her home, and Markoff suggested she lend him some of the proceeds. In her complaint, Franko alleged that during her discussion with Markoff concerning this proposal, Markoff made a number of false representations concerning insurance coverage on his life, his net worth, the amount of his equity in his home, the encumbrances on his home, his obligations to his former wife, the market value of his home, and the amount he would receive from the sale of his home.

Franko first met appellee Mitchell at a delicatessen in Scottsdale while she was having lunch with Markoff. Mitchell came into the delicatessen for lunch, whereupon Markoff introduced Mitchell to Franko as an attorney he knew. Nothing was said at that time concerning any representation of Franko or Markoff by Mitchell.

In March or April of 1983, Franko decided to lend Markoff money so he could make a down payment on a bar. Around June 13, 1983, Franko and Markoff discussed specific terms under which Franko would lend Markoff $30,000 for that purpose. According to Markoff, because he cared for Franko, he told her he wanted her to be protected with regard to repayment of the loan through an insurance policy on his life and an "interest" in the proceeds from the eventual sale of his home. Markoff also told Franko that a lawyer should prepare the loan documentation to provide the protection Markoff wanted Franko to have. Markoff specifically recommended that Mitchell, who Markoff told Franko was "extremely competent to draw up a note for us," should prepare the necessary documentation for the protection of both Markoff and Franko. Because both Franko and her son had faith in Markoff, Franko accepted Markoff's recommendation. Markoff told Franko he would make an appointment with Mitchell on Franko's behalf.

In June 1983, while Franko was not present, Markoff telephoned Mitchell to make an appointment to meet with him. During that conversation, Markoff outlined for Mitchell the terms of the promissory

note that Franko and Markoff had discussed. Markoff testified:

Q. Now, when you called Mr. Mitchell a week or so before July 6, was it your intention that you were seeking legal help for both yourself and Circie?

A. No, I wasn't seeking legal help. I was seeking someone to draw up a legal document.

Q. For the protection of both you and Circie?

A. My intentions were to protect her as best I possibly could.

Q. And it was your belief that the attorney that you were recommending to her would serve that purpose, is that correct?

A. I had faith in Mr. Mitchell as being a competent attorney to draw up the document that I needed drawn up.

Q. Did you see Mr. Mitchell in your mind's eye when you talked with him on the telephone that day a week or so prior to July 6 as only being your lawyer and not Circie's lawyer?

A. I didn't see him in the eyes of being anyone's lawyer. I saw him drawing up a document that I needed drawn up.

Markoff also testified:

Q. Did you make ... known to Mr. Mitchell that you had that kind of feeling about Circie, that you wanted to protect her?

A. I didn't discuss my personal relationship with Circie with Mr. Mitchell or anyone other than where it belonged.
 . . . .

Q. Now, in your conversation with Mr. Mitchell on the telephone approximately one week or so prior to July 6, did you tell him that the note that you wanted him to draft was intended for the protection of both you and Circie, that you wanted protection for this lady?

A. I don't remember using those specific words to him. I remember asking him to draw up a note for a loan that I was contemplating making that way, someone loaning money that way. And I wanted a note drawn up.

Q. To protect both parties.

A. I don't remember whether I said that directly or not. All I asked him to do is draw up a note in legal phraseology.

Although Markoff testified that it was his own understanding that Franko would be going with him to Mitchell's office when the note was ready for signature, Markoff also testified that he did not recall telling Mitchell or anyone that Franko would be coming with him at that time. Markoff testified "I would assume that from the prior conversations with Mr. Mitchell in drawing up the note, that we would both sign the note at his office."

The escrow on Franko's house closed on July 5, 1983, and she received in excess of $40,000 as a result. That same day, Markoff called Mitchell's office and asked Mitchell's secretary when the note would be ready. Markoff was advised to call back the following morning. The next day, Markoff picked Franko up at her home, and the two drove to Mitchell's office in Scottsdale.

Mitchell, Markoff and Franko met together in Mitchell's office. During that meeting, Mitchell never stated that he was acting as Franko's attorney in connection with preparing the note, but he also never said that he was not. During the discussion, Markoff told Mitchell what he wanted in the promissory note and Mitchell made notes on a legal pad. Markoff told Mitchell he wanted the note to state that Franko was lending him the money, that it would be paid back in a certain way, and that the note should be repaid from the proceeds from the sale of Markoff's house and backed by term insurance on Markoff's life.

Concerning the meeting, Markoff testified:

Q. When you met with [Mitchell] in his office with Circie, did you indicate to him that it was your intention that both you and she be protected with regard to that instrument that was to be signed by you?

A. That was something I discussed with Circie and her son. And I assumed

that by drawing up a legal document with reference to the loan between she and I that way, this was our protection. It's a legal document.

Q. Was that, however, discussed in Mr. Mitchell's office with you and she and Mr. Mitchell in attendance?

A. Not to what I can recall that way.

Q. What is it that you recall concerning what you told Mr. Mitchell concerning protection?

A. All I recall is asking him to draw up a legal note and telling him what to put in the note.

At one point during the meeting in his office, Mitchell asked if there was anything else to be put into the note. Franko asked Markoff if he wanted anything else in the note and Markoff said he did not. Franko then told Mitchell she thought that everything had been covered. At another point in the meeting, Mitchell looked directly at Franko and told her that Markoff should set up the monthly premium on the term life insurance so that if Markoff did not pay it, a notice would be sent to Franko so she could pay it to keep the policy in force. Mitchell told her that this would eliminate the possible loss of the insurance.

The promissory note Mitchell prepared provided as follows:

$60,000.00 Scottsdale, Arizona
 July 6, 1983

For value received the undersigned hereby promises to pay to Circie Franko, or order, at Scottsdale, Arizona, upon the terms and conditions following, the sum of Sixty Thousand Dollars ($60,000.00) in monthly installments of One Thousand Dollars ($1,000.00) including interest, commencing two (2) months from the date hereof, and continuing until the entire balance has been paid, from the income of 19th Avenue Food and Liquor, provided however, that upon the sale of the residence of the undersigned at 6565 East Shea Boulevard, Scottsdale, Arizona, there shall be paid from the proceeds, to the extent available, the difference between one-half of the face amount of

this Note and one-half of the monthly installments theretofore made.

All amounts are payable in legal tender of the United States of America, and undersigned hereby waives notice, presentment and demand and agrees that any forebearance in the event of default shall not thereafter prohibit strict enforcement of this obligation according to its terms.

This Note is secured by the proceeds of a decreasing term life insurance policy on the life of the undersigned in the original face amount of Thirty Thousand Dollars ($30,000.00). In the event of the death of the undersigned prior to payment of the entire balance, the payee or holder shall be entitled to payment of the balance only from the sources herein mentioned and shall have no claim against the estate of the undersigned for any deficiency, over and above payment of one-half of the face amount of this Note, less one-half of the monthly installments theretofore made.

After the note had been typed, Mitchell handed it to Franko and she read it. Mitchell and Markoff both explained to Franko that the $60,000 face amount of the note included $30,000 interest. Mitchell asked Franko if the note had everything in it she wanted, and she replied that it did. Franko asked Mitchell if the note was "legal" and "had everything it should have." Mitchell said that it did. Franko then asked him what she should do with it, and Mitchell told her to keep it in a safe place. Markoff then executed the note.

Before the meeting, Franko had told Markoff she wanted to pay Mitchell's fee. Markoff insisted on paying the fee himself, and did so. Franko did not offer to pay the fee in Mitchell's presence.

Mitchell's affidavit in support of his motion for summary judgment stated, in pertinent part:

2. That Affiant has known Carl L. Markoff, Sr., ... for more than ten years.

3. That prior to July 5, 1983, said Carl Markoff called Affiant at his home and inquired if Affiant could prepare a prom-

issory note for Mr. Markoff to evidence indebtedness in the form of a loan Markoff would be receiving from Ms. Circie Franko.

4. That during the course of their telephone conversation, Mr. Markoff explained the terms of the loan and what he wanted the promissory note to contain. Affiant advised Mr. Markoff to call his office during regular business hours to make an appointment to pick up the note.

5. That Mr. Markoff called Affiant's office on July 5, 1983 and inquired through Affiant's secretary when the note would be ready, and Mr. Markoff was advised to call back the following morning after 9:00 A.M.

6. That Mr. Markoff and Ms. Franko arrived at Affiant's office on [July 6, 1983] at which time Affiant and Mr. Markoff discussed the note further, in the presence of Ms. Franko. During the course of this discussion, all of the dialogue was between Affiant and Mr. Markoff.

7. That Affiant then proceeded to prepare the promissory note in accordance with instructions which he had received from Mr. Markoff. After drafting the note, he showed it to Mr. Markoff and Ms. Franko, who both indicated that it was satisfactory to them.

8. That as Mr. Markoff and Ms. Franko left Affiant's offices, Mr. Markoff paid Affiant for his services.

9. That Mr. Markoff had introduced Ms. Franko to Affiant on at least one occasion prior to July 6, 1983, but that he had never had any other discussion with her prior to July 6, 1983.

10. That Ms. Franko has never at any time asked Affiant for legal advice or to provide any legal services for her and that he had never agreed to provide any such professional services to her as a client.

Either at Mitchell's office or after Franko and Markoff left his office, Franko gave Markoff a check for $30,000. Franko never received any payments from Markoff on the $30,000 loan. She received nothing from the later sale of Markoff's home and, at one point, learned that the former owners of the bar had taken it over and that Markoff could no longer be reached there. Also, as far as Franko was aware, Markoff never took out the required term life insurance. The parties are in agreement that Markoff's note is uncollectible.

## PROCEDURAL HISTORY

Franko commenced the instant litigation on May 31, 1985. Her complaint asserted breach of contract and fraud claims against Markoff and breach of contract and legal malpractice claims against Mitchell. Markoff failed to answer the complaint, and a default judgment against him and in favor of Franko was entered on October 10, 1985.

After answering the complaint, appellee Mitchell moved for summary judgment, arguing that he had not entered into an attorney-client relationship with Franko and owed no duty to her which could give rise to an action for breach of contract or legal malpractice. In response, Franko argued there were genuine issues of material fact concerning whether there was an attorney-client relationship between Mitchell and Franko and that, even in the absence of an attorney-client relationship, Mitchell had a duty to exercise reasonable care to protect her interests under the circumstances. The trial court granted Mitchell's motion for summary judgment by minute entry of April 8, 1986, without stating its reasons. The trial court also denied Franko's subsequent motion for reconsideration and motion to vacate the order denying the motion for reconsideration. From the trial court's formal written orders granting Mitchell's motion for summary judgment and denying Franko's post-judgment motions, Franko timely brought this appeal. We have jurisdiction pursuant to A.R.S. §§ 12–2101(B) and (F)(1).

## BREACH OF CONTRACT

We first consider Franko's contention that there existed genuine issues of material fact, or conflicting inferences from undisputed facts, concerning whether an attorney-client relationship existed be-

tween Franko and Mitchell and that, therefore, the trial court erred in granting summary judgment for Mitchell on Franko's claim for breach of contract. *See State ex rel. Corbin v. Challenge, Inc.*, 151 Ariz. 20, 725 P.2d 727. Whether the attorney-client relationship exists presents an issue for the trier of fact. *Ronnigen v. Hertogs*, 294 Minn. 7, 199 N.W.2d 420 (1972). Franko notes that at the time she and Markoff met with Mitchell, they had a close, personal and nonadversarial relationship and that neither Mitchell nor Markoff told Franko that Mitchell was representing Markoff alone. Franko argues that, given the relationship between Markoff and Franko and the interactions between Franko and Mitchell at the meeting of July 6, 1983, a jury could reasonably conclude that Franko was entitled to rely on Mitchell as her attorney and that "[a]n attorney-client relationship thus existed between them that was violated as the result of Mitchell's failure adequately to protect Franko's interest with respect to the promissory note he prepared."

 In general, the relationship of attorney and client is a matter of contract except where an attorney is appointed by the court. 7A C.J.S. *Attorney & Client* § 169 at 249 (1980). The employment contract of an attorney consists of an offer or request by the client and an acceptance or assent by the attorney, or an offer by the attorney and acceptance of the offer by the client. *Id.* The contract may be express or implied from the conduct of the parties. *Matter of Petrie*, 154 Ariz. 295, 742 P.2d 796 (1987). An attorney who gives gratuitous advice will be held to the same standard of care as if he were under formal retainer. R. Mallen and V. Levitt, *Legal Malpractice* § 101 at 173–74 (1981); *see also, Holland v. Lawless*, 95 N.M. 490, 623 P.2d 1004 (App.1981).

The Arizona Supreme Court has recently held:

> An attorney-client relationship does not require the payment of a fee but may be implied from the parties' conduct. 7 Am. Jur.2d *Attorneys at Law* § 118 (1980); *In re McGlothlen*, 99 Wash.2d 515, 522,

663 P.2d 1330, 1334 (1983). The relationship is proved by showing that the party sought and received advice and assistance from the attorney in matters pertinent to the legal profession. 7 Am. Jur.2d *Attorneys at Law* § 118. The appropriate test is a subjective one, where 'the court looks to the nature of the work performed and to the circumstances under which the confidences were divulged.' *Alexander v. Superior Court*, 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984), citing *Developments of the Law—Conflicts of Interest in the Legal Profession*, 94 HARV.L.REV. 1244, 1321–22 (1981). An important factor in evaluating the relationship is whether the client thought an attorney-client relationship existed. *Alexander*, 141 Ariz. at 162, 685 P.2d at 1314. The relationship is ongoing and gives rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand that the relationship is no longer depended on. *In re Weiner*, 120 Ariz. 349, 352, 586 P.2d 194, 197 (1978).

*Petrie*, 154 Ariz. at 299–300, 742 P.2d at 800–01.

 Although there is no evidence that Franko or Markoff ever told Mitchell he was to provide legal services to Franko as well as to Markoff, Mitchell's statements to Franko concerning the insurance on Markoff and the legality and completeness of the note could be viewed as logically consistent with the existence of an attorney-client relationship between Franko and Mitchell, as well as the existence of an attorney-client relationship between Mitchell and Markoff. In our opinion, the evidence concerning the interactions between Franko and Mitchell in Mitchell's office can legally sustain an inference that Mitchell was acting as Franko's attorney and that there was an implied contract for legal services between them. Thus, there are conflicting inferences from the facts, and summary judgment on this issue was improperly granted.

 The evidence, however, fails to sustain Franko's alternative contention that

she was entitled to proceed against Mitchell for breach of contract on a third-party beneficiary theory. As our supreme court stated in *Norton v. First Federal Savings*, 128 Ariz. 176, 624 P.2d 854 (1981):

> The Arizona rule is that in order for a person to recover as a third-party beneficiary of a contract, an intention to benefit that person must be indicated in the contract itself, *Irwin v. Murphey*, 81 Ariz. 148, 302 P.2d 534 (1956); *Basurto v. Utah Construction & Mining Company*, 15 Ariz.App. 35, 485 P.2d 859 (1971). The contemplated benefit must be both intentional and direct. *Irwin, supra, Treadway v. Western Cotton Oil Etc. Co.*, 40 Ariz. 125, 10 P.2d 371 (1932), and 'it must definitely appear that the parties intend to recognize the third party as the primary party in interest,' *Irwin, supra,* at 154, 302 P.2d at 538.

*Id.* at 178, 624 P.2d at 856. In order to consider Franko's alternative theory, we must assume that there was neither an express nor implied contract between Franko and Mitchell. Accordingly, Markoff and Mitchell would have to be the sole parties to the contract. Although there is ample evidence that Markoff told Franko he wanted to protect her interests and was having Mitchell prepare the promissory note, there is no evidence from which a trier of fact could reasonably infer that Mitchell had a similar understanding about the purpose of the transaction. The substantive terms of the note Mitchell drafted fully accord with this view. The illusory protections the note provided for Franko could only support the inference that Mitchell had no understanding that its preparation was primarily to benefit Franko. Therefore, the trial court properly granted summary judgment to Mitchell on Franko's third-party beneficiary claim.

## NEGLIGENCE (LEGAL MALPRACTICE)

■ Franko's second claim is for legal malpractice. Specifically, she asserts that, even if Mitchell was not her attorney, he had a duty to protect her interests independent of the attorney-client relationship and that this duty was breached. Franko urges us to impose such a duty pursuant to the test adopted in *Fickett v. Superior Court*, 27 Ariz.App. 793, 558 P.2d 988 (1976). Although we believe *Fickett* may be applicable in situations similar to the one here, we conclude that Franko misconstrues the nature and extent of the duty owed by an attorney to a third party pursuant to *Fickett*.

A plaintiff may maintain an action in negligence by showing that the defendant owed plaintiff a duty, that the duty was breached, and that the breach proximately caused an injury which resulted in actual damages. *Donnelly Const. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 677 P.2d 1292 (1984). Although a duty may be found pursuant to a contract, privity of contract is not a necessary element of a duty in a tort claim. *Id.* at 187, 677 P.2d at 1295. Accordingly, the mere absence of an attorney-client relationship, that is, privity of contract, will not bar a tort claim. Thus, we agree with Franko that our decision in *Chalpin v. Brennan*, 114 Ariz. 124, 559 P.2d 680 (App.1976), does not preclude Franko's claim for negligence.

In *Chalpin*, the defendant was legal counsel for a corporation. In that capacity, he drafted certain option contracts and an employment-management agreement which allegedly contained material misrepresentations of fact. Plaintiff, who purchased stock in the corporation, brought a negligence claim against the defendant for legal malpractice. The trial court granted summary judgment for the defendant, and this court affirmed on appeal. We characterized the issue before us as "[w]hether an attorney should be held liable for legal malpractice to a third party not his client and not in privity with him...." 114 Ariz. at 125, 559 P.2d at 681. We stated:

> To impose upon counsel the responsibility of fully representing his client's interests in a contractual situation and at the same time making him liable to a third party to the transaction for fraud and misrepresentations under malpractice theory we believe to be unreasonable and unwise. A holding to the contrary could conceivably encourage a party to contractual negotiations to forego per-

sonal legal representation and then sue counsel representing the other contracting party for legal malpractice if the resulting contract later proves disfavorable in some respect.

We believe the soundest rule to be applied to the facts of this case is set forth in the line of cases which refuses to grant a cause of action for malpractice to an individual who is not a client or in privity with the attorney.

We do not condone the actions of attorney Brennan in this case, but believe that under Arizona law the proper remedy for his actions is the imposition of disciplinary proceedings through 17A ARS Sup. Ct.Rules, rule 29, et seq., and not by creation of a new cause of action founded on malpractice theory.

*Id.* at 126, 559 P.2d at 682 (citations omitted).

Less than one month after *Chalpin* was decided, Division Two of this court decided *Fickett v. Superior Court,* 27 Ariz.App. 793, 558 P.2d 988. In that case, the successor guardian of an incompetent brought a negligence action against the attorney for the former guardian, alleging that the attorney had owed to the incompetent a duty to exercise reasonable care to prevent the former guardian from misappropriating the incompetent's funds. The trial court denied the attorney's motion for summary judgment, and the attorney sought special action relief. Division Two of this court denied relief, specifically rejecting the attorney's contention that he had owed no duty to the incompetent because the attorney-client relationship was strictly between the attorney and the former guardian. The court stated:

We are of the opinion that the better view is that the determination of whether, in a specific case, the attorney will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among

which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injuries suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

*Id.* at 795, 558 P.2d at 990 (citations omitted). *See generally* Note, 19 Ariz.L.Rev. 653 (1977).

In *Travelers Insurance Co. v. Breese,* 138 Ariz. 508, 675 P.2d 1327 (App.1983), this court characterized *Chalpin* as having chosen to impose a privity requirement "under the facts in the case." *Id.* at 513, 675 P.2d at 1332. Further, in resolving the particular issue before it, the *Breese* court's analysis exclusively applied the *Fickett* balancing test, though it also noted that "the more restrictive approach adopted in *Chalpin* " would also have denied a cause of action. *Id.* at 514, 675 P.2d at 1333.

Thereafter, our supreme court definitively rejected the privity requirement for malpractice liability in *Donnelly Construction Co.,* 139 Ariz. 184, 677 P.2d 1292. In reversing the dismissal of a contractor's claim against an architect for negligently preparing plans and specifications the contractor followed to its detriment, the *Donnelly* court stated: "There is no requirement of privity in this state to maintain an action in tort." *Id.* at 187, 677 P.2d at 1295. The court specifically noted the *Chalpin* court's refusal to grant a cause of action for legal malpractice to one who is not a client or in privity with the defendant attorney, and stated that it "expressly disapprove[d] such blanket denials of causes of action...." *Id.* at 188, 677 P.2d at 1296. The court stated it would instead confront each such case as it came before it.[1] We

1. In *Schroeder v. Hudgins,* 142 Ariz. 395, 690 P.2d 114 (App.1984), decided six months after *Donnelly,* we noted that under *Chalpin* a claim for attorney malpractice cannot be sustained when the claimant is neither a client nor in privity with the attorney. In view of *Donnelly* 's

clear language, that proposition is no longer the law in Arizona, and the *Schroeder* court's citation to *Chalpin* was in error. We note, however, that the *Schroeder* court ruled against the claimant in that case on the ground that he had failed to support his allegation that the defend-

note, however, that the *Donnelly* court did not specifically overrule *Chalpin*, but merely disapproved its privity analysis.

■ In light of the *Donnelly* court's statement that questions of duty in malpractice cases brought by non-clients must be determined on a case-by-case basis, we deem it appropriate to follow the *Fickett* balancing test when determining whether an attorney's liability should be extended to a third party. 27 Ariz.App. at 795, 558 P.2d at 990. We are of the opinion, however, that the test utilized in *Fickett* does not create a distinct duty of care towards a third party, as Franko suggests, but instead allows a third party in certain situations to sue an attorney for negligence to his client. That is, under the *Fickett* test any duty owed by an attorney to a third party is derivative of the duty owed by that attorney to his client.

■ Much like a third-party beneficiary can sue to enforce a contract made for his benefit, in certain circumstances, a third party non-client can sue an attorney for breach of the attorney-client contract. The test adopted in *Fickett* is concerned with the policy factors which may justify the extension of liability for negligent conduct beyond those persons who were in privity with the negligent person. *Baldock v. Green*, 109 Cal.App.3d 234, 167 Cal.Rptr. 157 (App.1980). "However, it is clear that before reaching the issue of how far the liability of a negligent attorney extends it must first be determined that the attorney committed a negligent act; that is, failed to use such skill, prudence and diligence as other members of the profession commonly possess and excercise." *Id.* at 239, 167 Cal.Rptr. at 160. In short, at a minimum, there must be an allegation that the defendant attorney was negligent towards his

client before utilizing a *Fickett*-type analysis to determine whether such liability should be extended to a third person.

Although typically not discussing this "lawyer-client negligence threshhold," in virtually every case finding an attorney liable to a third party, there was negligence between the attorney and his client.[2] *Heyer v. Flaig*, 70 Cal.2d 223, 74 Cal.Rptr. 225, 449 P.2d 161 (1969); *Licata v. Spector*, 26 Conn.Supp. 378, 225 A.2d 28 (1966). Similarly, an attorney retained by a collection agency to file suit on a debt who negligently caused the suit to be dismissed, was held liable to the nonclient creditor. *Donald v. Garry*, 19 Cal.App.3d 769, 97 Cal.Rptr. 191 (1971). In *United Leasing Corp. v. Miller*, 45 N.C.App. 400, 263 S.E.2d 313, *pet. den.*, 300 N.C. 374, 267 S.E.2d 685, *and later app.*, 60 N.C.App. 40, 298 S.E.2d 409, *pet. den.*, 308 N.C. 194, 302 S.E.2d 248 (1983), a lessor stated a cause of action against an attorney, hired by a lessee to make a title search, due to the attorney's negligence in failing to discover the existence of a lien. In short, Franko has cited no authority, and we have found none, to support her proposition that an attorney can be held liable to a third party in negligence under a *Fickett*-type analysis absent an allegation that the attorney was negligent to his client or that a unique fiduciary relationship existed between the attorney and third party. *See generally*, Annotation, *Attorney's Liability, to One Other than Immediate Client, for Negligence in Connection with Legal Duties*, 61 A.L.R.4th 615 (1988).

The importance of this threshhold determination is demonstrated in *Baldock v. Green*, 109 Cal.App.3d 234, 167 Cal.Rptr. 157. There, a life estate consisting of cash was distributed to the widower of the dece-

---

ant attorney had undertaken his legal representation. It is apparent from the *Schroeder* court's opinion that the claimant had not contended that the attorney owed any duty to him independent of the attorney-client relationship he alleged had existed between them. Accordingly, the court's reference to the *Chalpin* privity requirement was unnecessary to its decision.

**2.** A narrow exception to this general rule is found in *Fickett* itself. There, liability was not

grounded on an attorney's negligence to his client, but on the unique fiduciary relationship between a guardian and a ward. "[W]hen an attorney undertakes to represent the guardian of an incompetent, he assumes a relationship not only with the guardian but also with the ward." *Fickett*, 27 Ariz.App. at 795, 558 P.2d at 990; *see also*, Note, 19 Ariz.L.Rev. at 662, n. 101. Here, no such fiduciary relationship exists.

dent, with one-half of the remainder interest vesting in the decedent's daughter and one-half vesting in her grandchildren. The widower was also the executor of the estate. Upon distribution, the widower/executor deposited the money in a savings account naming decedent's daughter as residuary legatee. After his death, all remaining funds in the account were released to the daughter.

The grandchildren brought a malpractice action against the attorney for the estate's executor. The complaint alleged that the attorney had negligently advised and negligently failed to direct the actions of the executor, resulting in the loss of the remainder interest. The court observed that the attorney only represented the executor, and concluded he was not negligent in such representation. *Id.* at 239–41, 167 Cal. Rptr. at 161. In the absence of any negligence between the attorney and his client, the *Baldock* court saw no reason to undertake a *Fickett*-type analysis. *Id.* at 239, 167 Cal.Rptr. at 161. The court also noted that the plaintiffs were not deprived of their remedy against the "real culprit"— the executor's estate and the executor's daughter. *Id.* at 241, 167 Cal.Rptr. at 167.

Similarly, in *Marker v. Greenberg,* 313 N.W.2d 4 (Minn.1981), a son brought a malpractice action against an attorney who had drafted deeds, at the request of the father, conveying real estate to the father and son as joint tenants. After the father's death, the entire value of the real estate was included in the gross estate for tax purposes because it was held in joint tenancy. The son alleged that the attorney was negligent in not conveying the property as a tenancy-in-common, thus decreasing the tax liability. After acknowledging the test adopted in *Fickett,* the Supreme Court of Minnesota refused to find that the attorney owed a duty to the son. The court noted that there was no invalidity or legal deficiency in the will and that the plaintiff did not allege that the disposition of the property was contrary to the intent of his fa-

ther. *Id.* 313 N.W.2d at 6. Accordingly, the court concluded that the estate taxes due were the result of the father's wishes, and not the result of any negligence by the attorney. *Id. See also, Hiemstra v. Huston,* 12 Cal.App.3d 1043, 91 Cal.Rptr. 296 (1970); *Ventura City v. Holloway,* 40 Cal. App.3d 897, 115 Cal.Rptr. 464 (App.1974).

Here, Franko does not allege, and the record does not disclose, any negligence between Mitchell and Markoff. The uncontroverted evidence is that Markoff alone told Mitchell what to include in the note and that Mitchell drafted the note precisely as instructed. In his deposition, Markoff testified that the provisions in the note were the ones he told Mitchell to include and that he never asked Mitchell to prepare a "security" or lien agreement. Similarly, Franko testified by deposition that she told Mitchell that the note "included everything." As in *Marker,* there was no invalidity or legal deficiency in the note, and Franko does not allege that the note was drafted contrary to the communicated intent of Markoff.[3] Accordingly, we conclude, as did the court in *Marker,* that any consequences of Mitchell's actions were due to his client's wishes, not as a result of Mitchell's negligence.

In essence, the *Fickett* test is merely a framework for determining the particular circumstances under which a third party may sue an attorney for malpractice in the place of the client. That is, in some situations, an attorney owes a duty to a third party to use ordinary skill, care and diligence in rendering professional services to his client. Absent even an allegation of negligence between Mitchell and Markoff, Franko's reliance on *Fickett* to extend liability to Mitchell is inappropriate. *Baldock,* 109 Cal.App.3d 234, 167 Cal.Rptr. 157. Since this is the only theory of third-party liability urged at trial and on appeal, we conclude that the trial court properly granted summary judgment to Mitchell on

---

**3.** Although there is evidence that Markoff wanted to give Franko all of the protection he could, Markoff also testified that he does not remember ber informing Mitchell of this intention. Markoff simply told Mitchell what to put in the note.

this theory.[4]

Because this matter must be reversed in part and remanded for further proceedings, during which Franko may move pursuant to Rule 15(a), Ariz.R.Civ.P., to amend her complaint, we do not address Franko's contention that her lawsuit should also be permitted to proceed on a theory of negligent misrepresentation.

## ATTORNEY'S FEES

 Franko has requested an award of attorney's fees on appeal pursuant to A.R.S. § 12–341.01(A). This provision is inapplicable in legal malpractice actions. *Barmat v. Partners*, 155 Ariz. 519, 747 P.2d 1218 (1987). We therefore deny the request.

The judgment of the trial court dismissing the third-party beneficiary contract claim and the legal malpractice claim is affirmed; the dismissal of the attorney-client contract claim is reversed and this matter remanded to the trial court for proceedings in accordance with this decision.

FROEB, Judge, concurring in part and dissenting in part.

The facts of this case are not complicated. Markoff wished to open a bar. To do so, he borrowed $30,000 from Franko. He told Franko he would have Mitchell, a lawyer, prepare the legal papers necessary to protect her interest. Markoff contacted Mitchell and gave him the information needed to prepare the promissory note. He did not ask Mitchell to do anything to protect the interests of Franko. He simply asked Mitchell to prepare a legal document evidencing the contemplated loan. Mitchell was not asked to prepare anything which would secure payment of the debt by collateralizing property owned by Markoff.

After signing the note, Franko gave Markoff a check for $30,000. When Markoff failed to make any payments on the note and left town, Franko obtained a default judgment against Markoff. Since she was unable to collect on the judgment, she now seeks to recover the money from Mitchell based upon an alleged attorney-client relationship between her and Mitchell which arose the day she went to Mitchell's office with Markoff to pick up the promissory note. The spotlight in this case, therefore, is necessarily on that brief meeting. In my opinion, the few words casually exchanged between Franko and Mitchell could not reasonably make Mitchell liable as a lawyer to Franko either in contract or tort. Therefore, I concur with the portion of Judge Greer's opinion rejecting tort liability and disagree with the portion that holds there are sufficient facts to sustain contract liability based upon the supposed attorney-client relationship.

The cases brought to our attention deal, for the most part, with breaches of the attorney-client relationship in situations where there is no question that the relationship existed. Here, the issue is whether an attorney-client relationship was established in the first instance. If it was, then it may have been breached because Mitchell did not "protect" Franko's interests, nor did he try to. Simply put, if Mitchell was Franko's lawyer, he no doubt would have advised Franko to insist on security for the repayment of the loan. However, Franko cannot recover losses stemming from her inability to collect on the promissory note prepared by Mitchell absent an attorney-client relationship.

An attorney-client relationship is a contractual relationship. It is created by an offer or request by the client and an acceptance or assent by the attorney, or vice versa. The contract may be express or implied from the conduct of the parties. 7A C.J.S. *Attorney & Client* § 169 at 249, 250; *Zych v. Jones*, 84 Ill.App.3d 647, 40 Ill.Dec. 369, 406 N.E.2d 70 (1980). The contract of employment cannot be created by one party alone. *Zych v. Jones*, 84 Ill.App.3d at 651, 40 Ill.Dec. 369, 406 N.E. 2d at 74. The Arizona Supreme Court decision in *Matter of Petrie*, 154 Ariz. 295, 299, 742 P.2d 796, 800 (1987) sets forth elements of an attorney-client relationship:

---

**4.** This holding does not necessarily preclude a legal malpractice action if an attorney-client relationship is established between Franko and Mitchell.

An attorney-client relationship does not require the payment of a fee but may be implied from the parties' conduct. 7 Am.Jur.2d *Attorneys at Law* § 118 (1980); *In re McGlothlen,* 99 Wash.2d 515, 522, 663 P.2d 1330, 1334 (1983). The relationship is proved by showing that the party sought and received advice and assistance from the attorney in matters pertinent to the legal profession. 7 Am. Jur.2d *Attorneys at Law* § 118. The appropriate test is a subjective one, where "the court looks to the nature of the work performed and to the circumstances under which the confidences were divulged." *Alexander v. Superior Court,* 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984), citing *Developments of the Law—Conflicts of Interest in the Legal Profession,* 94 HARV.L.REV. 1244, 1321–22 (1981). An important factor in evaluating the relationship is whether the client thought an attorney-client relationship existed. *Alexander,* 141 Ariz. at 162, 685 P.2d at 1314. The relationship is ongoing and gives rise to a continuing duty to the client unless and until the client clearly understands, or reasonably should understand that the relationship is no longer depended on. *In re Weiner,* 120 Ariz. 349, 352, 586 P.2d 194, 197 (1978).

In my opinion, there is no reasonable evidence of an express or implied contract of employment or attorney-client relationship between Franko and Mitchell. Judge Greer and Judge Grant find to the contrary relying on the fleeting exchange which took place in Mitchell's office. Franko gave her version of this meeting in her deposition, the key portions of which are set forth:

[Counsel for Mitchell]

Q. All right. Was there any ... reason ... that led you to believe that Mr. Mitchell knew that you were regarding him as your attorney and that you were regarding yourself as his client?

[Counsel for Franko]

Are you referring to any of the conversations that took place in the office?

[Counsel for Mitchell]

That's correct.

[Franko]: Well, Mr. Mitchell told me that regarding the term life insurance that Mr. Markoff should have the monthly payment—he wanted it set up in such a way if Mr. Markoff could not make the monthly payment so that it was sent to me so I could make it and keep the insurance policy in force. He told me that that would eliminate possibly the loss of the insurance through negligence of payment or something like that.

\* \* \* \* \* \*

Q. Was there anything else that took place during the course of your conversation that led you to believe that Mr. Mitchell was acting as your attorney in connection with preparing this promissory note?

A. Well, he never said he was not.

Q. Was there anything else said by anyone, Mr. Mitchell, Mr. Markoff or yourself during the course of this meeting which reinforced your belief that Mr. Mitchell was acting as attorney for you personally?

\* \* \* \* \* \*

A. I asked Mr. Mitchell if the promissory note was legal, if it had everything it should have. And he said, yes, it did. I asked him what I should do with it, and he told me to keep it in a safe place.

Q. Was there anything else besides that during the course of your meeting that led you to believe that Mr. Mitchell was undertaking the representation of you personally?

A. Well, he handed me the promissory note to read after it had been typed and I read it.

Q. Was there anything else besides everything you have previously described that led you to believe that Mr. Mitchell was representing you?

A. He asked me if the note had everything in it that had been wanted in it and I said, yes.

I do not believe this short conversation can be escalated into an attorney-client relationship, especially in light of Franko's previous experience with attorneys. It is

unreasonable for Franko to have believed that Mitchell was her attorney in this matter. Franko had dealt with attorneys on at least two previous occasions. Franko acknowledged that on each of these occasions fees were discussed as a preliminary matter before representation began. Yet, Franko never discussed fees with Mitchell. Additionally, as the deposition testimony shows, Franko did not receive legal advice from Mitchell. The first comment he made had to do with life insurance. It was not legal advice and did not establish an attorney-client relationship. It informed Franko she could arrange for premium nonpayment notices to be sent to her. The second comment was that the note was legal and it "had everything it should have." Mitchell's answer does not make Franko his client, even though Franko may have believed Mitchell had given her a legal opinion as his client at that moment. From the standpoint of Mitchell's representation of Markoff, the note had everything it should have. The third comment was that Franko should put the note in a safe place. Obviously this does not create the relationship Franko asserts.

In my opinion, Mitchell ought to have stated to Franko he was not acting as her lawyer. Had he done so, it is possible she would have taken steps to protect herself and this suit would not have followed. Yet, his failure to inform her that he was not her attorney does not make him liable to her for the money Markoff borrowed and did not repay. This is true even though Markoff led Franko to believe Mitchell would act to protect her. Mitchell was unaware of what had been said to Franko. From Mitchell's standpoint, Markoff was his only client. Accordingly, I would affirm the trial court's grant of summary judgment.

GRANT, Judge, concurring in part; dissenting in part.

I concur in Judge Greer's analysis and holding as to the breach of contract count of the complaint and as to attorney's fees.

As to negligence (legal malpractice) I dissent from Judge Greer's analysis and holding.

Judge Greer agrees that a plaintiff may maintain an action in negligence by showing that the defendant owed plaintiff a duty, that the duty was breached, and that the breach proximately caused an injury, which resulted in actual damages. *Donnelly Const. Co. v. Oberg/Hunt/Gilleland*, 139 Ariz. 184, 187, 677 P.2d 1292, 1295 (1984). Once an attorney-client relationship is established, the elements for legal malpractice are the same as for negligence —duty, breach, injury and damages. *Bowman v. TWO*, 104 Wash.2d 181, 704 P.2d 140 (1985).

A duty is a "relation between individuals which imposes upon one the legal obligation for the benefit of the other...." *Coburn v. City of Tucson*, 143 Ariz. 50, 52, 691 P.2d 1078, 1080 (1984), quoting W. Keeton, Prosser & Keeton on The Law of Torts, § 53 at 356 (5th ed. 1984). *See also Western Technologies, Inc. v. Sverdrup & Parcel, Inc.*, 154 Ariz. 1, 739 P.2d 1318 (App.1986). Franko does not claim that Mitchell would have owed her a duty of care had she not gone to his office and met with him. We agree. Absent that meeting, Mitchell knew only that his client was borrowing money to be secured in a certain way from another party. The law generally imposes no duty to protect an adversary in an arm's length transaction. Probert and Hendricks, *Lawyer Malpractice: Duty Relationships Beyond Contract*, 55 Notre Dame Lawyer 708, 718 (1980). *See* R. Mallen and V. Levit, *Legal Malpractice* §§ 80, 81 (2d Ed.1981); *Page v. Frazier*, 388 Mass. 55, 445 N.E.2d 148 (1983); *Clagett v. Dacy*, 47 Md.App. 23, 420 A.2d 1285 (1980). *See also Byrd v. Rothman*, 128 Ariz. 599, 602, 627 P.2d 1097, 1099 (App.1981).

Our inquiry, therefore, must necessarily focus on the interaction between Franko and Mitchell during that meeting. Was that meeting sufficient to create a duty owed to Franko by Mitchell? In answering the question we must consider the facts in the light most favorable to appellant Fran-

ko. *State ex rel. Corbin v. Challenge, Inc.*, 151 Ariz. 20, 725 P.2d 727 (App.1986).

Mitchell argues that an attorney-client relationship is always consensual and, because he did not agree to represent Franko, no relationship existed. Arguing that the standard should not be objective but rather subjective, Franko contends that a duty may arise when an unrepresented party reasonably believes that an attorney-client relationship has been formed. *Compare Connelly v. Wolf, Block, Schorr & Solis–Cohen*, 463 F.Supp. 914 (E.D.Pa.1978) with *DeVaux v. American Home Assurance Co.*, 387 Mass. 814, 444 N.E.2d 355 (1983). Our supreme court followed the latter rule in *Alexander v. Superior Court*, 141 Ariz. 157, 162, 685 P.2d 1309, 1314 (1984). In deciding whether a communication should be considered privileged, the court found persuasive the party's reasonable belief that the relationship existed. *Id.; see also Hughes v. Paine, Webber, Jackson & Curtis, Inc.*, 565 F.Supp. 663 (N.D.Ill.E.D. 1983); *In re McGlothlen*, 99 Wash.2d 515, 663 P.2d 1330 (1983); *Westinghouse Elec. Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311 (11th Cir.1978), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978). The party does not have to pay a fee or sign a written contract for this belief to be reasonable. *See Westinghouse*, 580 F.2d at 1319.

Although a duty may be found pursuant to a contract, privity of contract is not a necessary element of a duty in a tort claim. *Donnelly*, 139 Ariz. at 187, 677 P.2d at 1295. This is acknowledged in ̇ Judge Greer's opinion.

We are in agreement with Franko that our decision in *Chalpin v. Brennan*, 114 Ariz. 124, 559 P.2d 680 (App.1976) does not preclude Franko's claim for negligence.

In view of *Chalpin*'s demise, and the *Donnelly* court's statement that questions of duty in malpractice cases brought by non-clients must be determined on a case-by-case basis, Judge Greer deemed it appropriate to follow the *Fickett* balancing test in resolving the question of duty presented to us here. 27 Ariz.App. at 795, 588 P.2d at 990; quoted *supra* at 399, 762 P.2d at 1353. However, we must do so by looking at the facts in the light most favorable to Franko. First, Mitchell's preparation of a promissory note to evidence a $30,000 loan from Franko to Markoff was obviously intended to affect Franko to a great extent. It was Franko who provided the funds, and it was for Franko that the promissory note ostensibly created and defined Markoff's repayment obligations. Second, since Franko's legal rights and remedies for enforcing repayment of Markoff's debt depended on the provisions of the note Mitchell was to draft, harm to Franko was clearly foreseeable in the event Markoff was unable or unwilling to repay Franko's loan. Third, it is undisputed that Markoff failed to repay the loan and that the note was uncollectible, and thus there is a high degree of certainty that Franko suffered injury. Fourth, for the same reasons, Mitchell's conduct toward Franko was closely connected to the injury Franko ultimately suffered. Fifth, Mitchell's conduct toward Franko was morally blameworthy. Even though Mitchell himself admitted in the trial court that "[i]t does appear that there may have been a reasonable basis for Ms. Franko to have 'assumed' she was being represented by Mr. Mitchell," Mitchell never bothered to inform Franko that he was not acting as her lawyer or looking out for her interests, nor did he advise her that she should consult her own independent counsel. Mitchell's conduct may have violated former DR 7–104(A)(2),[5] DR 5–105(A) and (B),[6] Rule

---

5. DR 7–104(A)(2) provided:
 (A) During the course of his representation of a client a lawyer shall not:
 . . . .
 (2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of his client.

6. DR 5–105(A) and (B) provided:
 (A) A lawyer shall decline proferred employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of proffered employment, or if it would be likely to involve him in representing differing interests except to the extent permitted under DR 5–105(C).

29(a), Rules of the Supreme Court, in effect at the time Franko consulted Mitchell.

Finally, imposing a duty of care on Mitchell would promote the policy of preventing future harm by attaching potential civil liability to the moral and ethical breach that occurred here. In our opinion the *Fickett* analysis requires the conclusion that Mitchell owed a duty to exercise reasonable care to protect Franko's interests under the circumstances of this case. The trial court accordingly erred in granting summary judgment for Mitchell on Franko's claim for professional negligence.

Mitchell could have discharged his duty of care without impairing his own client's legitimate interests merely by making it clear to Franko that he was not representing her and that she should consult her own attorney concerning whether the promissory note he had drafted included legally acceptable protection of her interests.

As previously stated duty may be found pursuant to a contract, but privity of contract is not a necessary element of a duty in a tort claim. *Donnelly*, 139 Ariz. at 187, 677 P.2d at 1295. This is logical because:

> [i]f a lawyer could avoid liability in such a situation by claiming that there was no contract between the plaintiff and himself, the policies underlying attorney malpractice actions would be frustrated. There would be no incentive for lawyers who have not been formally retained to refrain from negligently giving legal advice, and parties harmed by such negligent advice would be uncompensated.

Note, *Attorney Malpractice: Use of Contract Analysis to Determine the Existence of an Attorney–Client Relationship*, 63 Minn.L.Rev. 751, 757 (1979).

Stated another way, the attorney must reasonably anticipate that harm or injury is likely to result from his or her conduct. W. Keeton, Prosser & Keeton on the Law of Torts § 53 (5th ed. 1984); *see also* Note, 63 Minn.L.Rev. at 759 n. 52.; *Byrd v. Roth-*man; *Lewis v. Swenson*, 126 Ariz. 561, 617 P.2d 69 (App.1980); *Togstad v. Vesely, Otto, Miller & Keefe*, 291 N.W.2d 686 (Minn.1980); *Bradford Sec. Processing Serv., Inc. v. Plaza Bank and Trust*, 653 P.2d 188 (Okla.1982). An attorney will incur a duty when he or she "knowingly or negligently lead[s] a non-client to believe he is dealing fairly and carefully with him and his interests." Probert & Hendricks, 55 Notre Dame Lawyer, 726–27. By doing so he or she may make "the situation worse, either by increasing the danger or by lulling the plaintiff into false security, or by depriving him of the possibility of help from someone else, or inducing him to forego it." W. Prosser, *The Borderland of Tort and Contract* in Selected Topics on the Law of Torts, 380, 418 (1953). *See also* R. Mallen and V. Levit, *Legal Malpractice* § 77 at 149–50; *Ishmael v. Millington*, 241 Cal.App.2d 520, 50 Cal.Rptr. 592 (1966). In sum, a court should look at the nature of the work involved and the circumstances of the interaction.

All the evidence indicates that Franko believed that Mitchell was looking out for her interests. We must ask whether that belief was reasonable and whether Mitchell should have anticipated the harm. Sufficient facts were alleged by Franko to answer in the affirmative. First, the meeting took place at Mitchell's office with no other attorneys present. Obviously, specific advice given to an unrepresented party in a formal office setting carries more weight than general advice given at a cocktail party. Second, Franko asked for and Mitchell gave what appeared to be "legal advice." *Tormo v. Yormark*, 398 F.Supp. 1159 (D.N.J.1975). Legal advice is often defined as giving an opinion as to the law applicable to the subject matter. *Togstad v. Vesely*, 291 N.W.2d at 692–93. *See also Vonck v. Harris*, 531 F.Supp. 672, 674 n. 3 (1982) and authority cited therein.

When an attorney explains to the other party that he or she is not representing their interest, the preparation and mere presentation of a note for execution does

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, or if it would be likely to involve him in representing differing interests, except to the extent permitted under DR 5–105(C).

not, without more, constitute advice or otherwise create an attorney-client relationship. *Dolan v. Hickey,* 385 Mass. 234, 236, 431 N.E.2d 229, 230 (1982). *See also Williams v. Burns,* 540 F.Supp. 1243 (D.Colo.1982). In this case not only was there no disclaimer about representation but there was also much more that the preparation and presentation of the note. Franko asked whether the note was "legal" and how she could enforce its terms. Although the questions were vague, they were clearly requests of Mitchell for his legal opinion on the validity and enforceability of the note. Finally, Mitchell addressed Franko as if she were a client. He gave the impression that he was equally concerned that the note reflect her intentions as well as Markoff's. He asked her, as well as Markoff, whether the note contained everything it should. These factors, taken together, support as reasonable, Franko's belief that Mitchell was representing her interests and should have alerted Mitchell to the possibility of harm to Franko because of it. Indeed, Mitchell admitted in the trial court that "[i]t does appear that there may have been a reasonable basis for Ms. Franko to have 'assumed' she was being represented by Mr. Mitchell."

Mitchell is not entirely wrong in asserting that an attorney must consent to an attorney-client relationship before it can arise. An attorney can always refuse to take on all the duties incident to the relationship. However, that refusal must be unequivocal. *In re Weiner,* 120 Ariz. 349, 586 P.2d 194 (1978); *Togstad v. Vesely, Otto, Miller & Keefe,* 291 N.W.2d 686 (Minn.1980); *Rice v. Forestier,* 415 S.W.2d 711 (Ct.Civ.App.Tex.1967); R. Mallen & V. Levitt, *Legal Malpractice,* § 72. This is critical in the case of an unrepresented person. *See* DR 7–104(A)(2), Rules of the Supreme Court, in effect at the time Franko consulted with Mitchell. Therefore I would reverse and remand for further proceedings on this count.