882 P.2d 26

**Candace LEYBA, Conservator of the Estate of Phillip Leroy Urioste, a minor, Plaintiff–Appellant,**

**v.**

**Joseph E. WHITLEY and Daniel W. Shapiro, Defendants–Appellees.**

**No. 14679.**

Court of Appeals of New Mexico.

June 30, 1994.

Certiorari Granted Sept. 8, 1994.

John S. Catron, W. Anthony Sawtell and Peter F. Wirth, Catron, Catron & Sawtell, P.A., Santa Fe, for plaintiff-appellant.

Martin E. Threet, Threet & King, Albuquerque, for defendant-appellee Joseph E. Whitley.

Joe L. McClaugherty and Cameron Peters, McClaugherty, Silver & Downes, P.C., Santa Fe, for defendant-appellee Daniel W. Shapiro.

Edward Ricco and James P. Bieg, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, for amicus curiae New Mexico Defense Lawyers Assn.

## OPINION

HARTZ, Judge.

This appeal raises questions regarding the liability of a lawyer to a non-client. In particular, if a lawyer represents a trustee, when, if ever, does the beneficiary of the trust have a cause of action against the lawyer? In the specific circumstances of this case we hold that the district court was largely correct in finding no liability, but we reverse the summary judgment in favor of the two defendant lawyers because there is evidence that could support at least one theory of liability.

## I. BACKGROUND

Corrine Urioste (Corrine) retained Defendant Joseph E. Whitley to assert a claim for damages against certain health care providers for the death in February 1990 of her son, Phillip Urioste (the Decedent). Whitley then associated with Defendant Daniel W. Shapiro to assist him in the litigation. Pursuant to the New Mexico Medical Malpractice Act, NMSA 1978, §§ 41–5–1 to 41–5–28 (Repl.Pamp.1989), Shapiro and Whitley filed an application with the medical review commission. Because New Mexico's Wrongful Death Act, NMSA 1978, §§ 41–2–1 to 41–2–4 (Repl.Pamp.1989), requires that such a claim be brought by and in the name of a personal representative of the decedent's estate, the claim was filed on behalf of Corrine, as personal representative of Decedent's estate. No lawsuit was ever filed. The parties settled the matter for $548,931.59.

All the settlement checks were made payable to Corrine, as personal representative of Decedent's estate. Some checks also included Shapiro and Whitley as payees. The checks were endorsed by all payees and deposited in Shapiro's trust account. After payment of fees and costs to Shapiro and Whitley, the net proceeds were $324,816.11. In the Spring of 1991 Corrine received the net proceeds in three checks drawn on Shapiro's trust account, each made payable simply to "Corrine Urioste." Nothing on the checks indicated that the funds were paid to her in any fiduciary capacity.

Under the Wrongful Death Act, when the decedent is unmarried the decedent's descendants should receive the proceeds of the wrongful death action. Section 41–2–3. At the time of his death Decedent was not married. He had, however, fathered a child by Candace Leyba. The child, Phillip Leroy Urioste (the Child), was born almost seven months after Decedent's death. Decedent had previously fathered two other children, but Decedent's parental rights and the children's right to inherit from him were terminated when the children were adopted by others. Thus, the proceeds of almost $325,-000 were for the benefit of the Child. Unfortunately for the Child, his grandmother, Cor-rine, dissipated more than $300,000 on herself and others.

When Corrine's defalcation was discovered, Candace Leyba, as conservator for the Child, sued Corrine, other recipients of the funds, Whitley, and Shapiro. This appeal concerns only the claims against the two lawyers.

Leyba contends that Shapiro and Whitley had a duty to disburse the net settlement proceeds only to a conservator for the Child, rather than to Corrine. Leyba also contends that Whitley and Shapiro failed to fulfill their duties to the Child with respect to the proper application of the proceeds by not taking steps—such as making the net-proceeds checks payable to "Corrine Urioste, as personal representative of the estate of Phillip Urioste"—to protect the Child's interest in the proceeds.

All parties sought summary judgment with respect to the liability of Whitley and Shapiro. The district court granted the lawyers' motions and denied Leyba's. One significant factual dispute, which the district court apparently found immaterial, was whether the lawyers had advised Corrine that the money was solely for the benefit of the Child. Included in the evidence presented by the Defendants were sworn statements that (1) the Defendants had instructed Corrine that the money was for the Child and (2) other persons had also advised Corrine of her fiduciary status. Corrine, on the other hand, testified at her deposition that Whitley told her the money was hers and that she thought the money was hers. She also testified that neither lawyer advised her that the money belonged to the Child and not her. In addition, she offered evidence that shortly before the wrongful-death claim was settled, Whitley prepared a contract which called for Corrine to purchase for $40,000 cash a mobile home for her own use once the settlement proceeds were distributed. The contract contained a provision that nullified the parties' obligations to perform in the event that there was no wrongful death recovery. There was no additional evidence that either Shapiro or Whitley had reason to believe that Corrine would misappropriate the settlement proceeds. Leyba submitted an affidavit by a

New Mexico lawyer expressing the expert opinion that Whitley and Shapiro committed malpractice. Shapiro and Whitley submitted a contrary affidavit by another New Mexico lawyer.

We first consider, and reject, Leyba's contention that Whitley and Shapiro had a duty to distribute the settlement proceeds to a conservator for the Child. Next we consider the contention that Whitley and Shapiro, as the lawyers in the wrongful death claim, had a duty to protect the Child's interest in the settlement proceeds. We hold that Shapiro and Whitley may be liable to the Child if they failed to advise Corrine that the settlement proceeds were for the Child's benefit and if this failure was a proximate cause of Corrine's defalcation. Because there is a genuine factual dispute on these matters, the summary judgment cannot stand.

## II. ALLEGED DUTY TO DISTRIBUTE PROCEEDS TO CONSERVATOR

Leyba argued in district court and now argues on appeal that she is entitled to partial summary judgment on the issue of liability because Shapiro and Whitley had a duty to distribute the settlement proceeds to a conservator for the Child. She contends that the payment from Shapiro's trust account to Corrine did not satisfy that duty and the Defendants must now make the required payment. *See Iverson v. Scholl, Inc.,* 136 Ill.App.3d 962, 91 Ill.Dec. 407, 483 N.E.2d 893 (Ct.1985) (life insurance proceeds paid to minor who endorsed the check to her father who appropriated proceeds to himself; insurer must pay the proceeds again; original payment was not legally sufficient because it was not made to a conservator for the minor).

In arguing on appeal that she is entitled to partial summary judgment on the issue of liability, Leyba recognizes that we have held that a party appealing the grant of a summary judgment is not entitled to challenge the denial of that party's own motion for summary judgment. *See Rivera v. King,* 108 N.M. 5, 7, 765 P.2d 1187, 1189 (Ct.App.), *cert. denied,* 107 N.M. 785, 765 P.2d 758 (1988). Leyba asks us to revisit *Rivera,* contending

that it is against the great weight of out-of-state authority.

We need not reconsider *Rivera.* Regardless of whether Leyba can appeal the denial of her motion for summary judgment, we still need to address her argument. After all, if it is correct, we must at least set aside the summary judgment granted Shapiro and Whitley. Our review of Leyba's argument, however, results in our rejecting it. Consequently, Leyba would not be entitled to partial summary judgment even if we can review the denial of her motion.

Turning to the merits, Leyba contends that Shapiro and Whitley owe her the net settlement proceeds because they had custody of money that belonged to the Child, owed him a duty to see that the money got to him, but paid the money to the wrong person. She relies on the provisions of the Wrongful Death Act regarding distribution of proceeds. The pertinent language is: "The proceeds of any judgment ... shall be distributed as follows: ... if there be no husband or wife, but a child or children, or grandchild or grandchildren, then to such child or children and grandchild or grandchildren by right of representation[.]" Section 41–2–3. The Child was thus the sole beneficiary of the proceeds of the wrongful-death claim.

Leyba argues that the only proper way to distribute the proceeds to the Child was through a conservator appointed to care for the Child's estate. Leyba notes that the New Mexico Probate Code provides:

A. Any person under a duty to pay or deliver money or personal property to a minor may perform this duty, in amounts not exceeding five thousand dollars ($5,000) per annum, by paying or delivering the money or property to:

(1) the minor, if he is married;

(2) any person having the care and custody of the minor with whom the minor resides;

(3) a guardian of the minor; or

(4) a financial institution for deposit in a federally insured savings account in the sole name of the minor and giving notice of the deposit to the minor.

B. This section does not apply if the person making payment or delivery has actual knowledge that a conservator has been appointed or proceedings for appointment of a conservator of the estate of the minor are pending....

NMSA 1978, § 45–5–103 (Repl.Pamp.1993). Because this provision applies only if the amount due the minor is less than $5000, Leyba argues that one must infer that amounts greater than $5000 have to be paid to a conservator. In support of this argument she quotes the following comment to Section 5–103 of the Uniform Probate Code, on which our Section 45–5–103 is based:

Where a minor has only a small amount of property, it would be wasteful to require protective proceedings to deal with the property. This section makes it possible for other persons, such as the guardian, to handle the less complicated property affairs of the ward. Protective proceedings, including the possible establishment of a conservatorship, will be sought where substantial property is involved.

Leyba concludes that the Uniform Act implicitly *compels* that payments of more than $5000 to a minor must be via a conservator.

■ The problem with this argument is that it rests on the assumption that it was the lawyers who had "a duty to pay or deliver money" to the Child. That duty, however, belonged to Corrine. As already noted, the Wrongful Death Act explicitly requires that any action "shall be brought by and in the name or names of the personal representative or representatives" of the decedent. Section 41–2–3. We have held to be defective a complaint in the name of a statutory beneficiary of wrongful-death benefits. *Mackey v. Burke,* 102 N.M. 294, 694 P.2d 1359 (Ct.App.1984), *cert. quashed,* 102 N.M. 293, 694 P.2d 1358 (1985), *overruled on other grounds by Chavez v. Regents of Univ. of N.M.,* 103 N.M. 606, 711 P.2d 883 (1985). We agree with the district court that implicit in the requirement that the personal representative bring the action is the requirement that the proceeds of the action be paid to the personal representative. To be sure, the ultimate destination of the proceeds is not the personal representative; it is the statutory beneficiaries. Nevertheless, the person legally charged with the responsibility to make the distributions to the statutory beneficiaries is the personal representative. Our cases have recognized that the personal representative owes the statutory beneficiaries the duties of a fiduciary in distributing the proceeds. *Stang v. Hertz Corp.,* 81 N.M. 348, 350, 467 P.2d 14, 16 (1970), quoted *Henkel v. Hood,* 49 N.M. 45, 51, 156 P.2d 790, 794 (1945), as follows: "[T]he personal representative who makes a recovery under the Act, ... serves as a trustee, a 'statutory trustee,' for discoverable and identifiable beneficiaries in the line of named kinship or descent." *See Baca v. Baca,* 71 N.M. 468, 473–75, 379 P.2d 765, 769 (1963). We find nothing in the Wrongful Death Act to suggest that the lawyers for the personal representative, the defendants in the wrongful-death action, or anyone else besides the personal representative has the duty to distribute the proceeds to the beneficiaries.

■ Perhaps, as Leyba argues, requiring distribution to a conservator would provide better protection to a statutory beneficiary who is a minor. *See* NMSA 1978, §§ 45–5–401 to 45–5–404 (Repl.Pamp.1993) (provisions of Probate Act governing conservators). Yet, ordinarily one who transfers funds to a fiduciary is entitled to assume that the funds will be handled properly. New Mexico has adopted Section 2 of the Uniform Fiduciaries Act. NMSA 1978, § 46–1–2 states (Repl. Pamp.1989):

A person who in good faith pays or transfers to a fiduciary any money or other property which the fiduciary as such is authorized to receive, is not responsible for the proper application thereof by the fiduciary[.]

*See National Casualty Co. v. Caswell & Co.,* 317 Ill.App. 66, 45 N.E.2d 698 (1942) (applying Section 2 to check written to fiduciary with no indication on check of payee's fiduciary capacity); *Cassel v. Mercantile Trust Co.,* 393 S.W.2d 433, 440–41 (Mo.1965) (same). Leyba does not challenge the good faith of the Defendants in issuing to Corrine the checks for the settlement proceeds.

In sum, we hold that Leyba has failed to establish a cause of action based on the lawyers' distribution of the settlement proceeds to Corrine.

### III. DUTY OF LAWYER TO NON-CLIENT

Leyba further contends that Whitley and Shapiro, as the result of their handling the wrongful-death litigation, had a duty to the Child to exercise reasonable care to protect his beneficial interest in the settlement proceeds. We agree in part and disagree in part.

#### A. Duty to Exercise Reasonable Care to Protect Interest of Beneficiary

We begin by rejecting the view expressed in Leyba's brief in chief that Whitley and Shapiro, as lawyers for a trustee, owed the beneficiary of the trust a general duty "to see to it that he received the settlement proceeds belonging to him."

■ At one time the issue could have been resolved summarily. The Child was not the client of Whitley or Shapiro. There was no privity of contract between the Child and the two lawyers. Until recent decades the absence of privity in itself would have barred any claim by the Child against the lawyers, except for fraud or collusion. *See* 1 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* §§ 7.1 to 7.4 (3d ed. 1989 & Supp. 1993) [hereinafter Mallen and Smith]. Now, however, courts examine the issue more carefully and predicate the presence or absence of liability of a lawyer to a non-client on policy grounds.

Leyba urges us to apply a balancing test first articulated in New Mexico by *Steinberg v. Coda Roberson Construction Co.,* 79 N.M. 123, 440 P.2d 798 (1968). Rejecting a lack-of-privity defense in a product liability action, our Supreme Court said that the determination of liability

is a matter of policy and involves the balancing of various factors, among which are [1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that he suffered injury, [4] the

closeness of the connection between the defendant's conduct and the injury suffered, and [5] the policy of preventing future harm.

*Id.* at 125, 440 P.2d at 800 (quoting *Stewart v. Cox,* 55 Cal.2d 857, 13 Cal.Rptr. 521, 362 P.2d 345, 348 (1961) (en banc)). Judge Bratton applied this balancing test in *Wisdom v. Neal,* 568 F.Supp. 4 (D.N.M.1982), holding that New Mexico law permitted the beneficiaries under a will to sue the lawyers for an estate who had incorrectly distributed the property of the estate per stirpes instead of per capita. No New Mexico appellate decision, however, has applied the balancing test in a lawyer malpractice action.

Although we endorse the holding in *Wisdom,* we refrain from applying the *Steinberg* balancing test in the context of lawyer malpractice. We have two concerns about applying the balancing test.

First, balancing tests are notoriously difficult to apply. If, for example, the five factors noted by *Steinberg* do not all argue for the same result, how does one then "balance" one factor against another? Judicial decisions applying the test can be unpredictable and inconsistent. *See Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744, 749–50 (1983) (criticizing California's application of the balancing test as leading to inconsistent results). Balancing tests have often served an important function in the law by starting a movement in a new direction and indicating some of the considerations that will guide future developments. The *Steinberg* balancing test has certainly served that function in New Mexico and other jurisdictions in eliminating outdated restrictions on tort liability predicated on the absence of privity. *See* Mallen & Smith, *supra,* § 7.11, at 383 ("The balancing test has been cited with approval and accepted with near unanimity by those jurisdictions which have examined the issue [in the malpractice context]."). Nevertheless, once a body of law has developed and courts and commentators gain new insights into the importance of different considerations in reaching an appropriate decision, often a balancing test can be replaced by more precise tests. Courts should not cling to a balancing test when they can provide clearer guidance.

Second, a balancing test designed to apply to a broad category of circumstances may overlook considerations that are crucial in various particular subcategories. The five factors listed in *Steinberg* may be perfectly appropriate in a product liability case but be quite deficient in another area of tort law, such as lawyer malpractice. *Steinberg* apparently appreciated this problem. In the passage quoted above, the Court stated that the five factors listed were not intended to be exclusive. 79 N.M. at 125, 440 P.2d at 800. Indeed, Leyba recognizes that some courts have added a sixth factor when applying the balancing test to lawyer malpractice: the burden on the profession that would be caused by recognition of liability under the circumstances. *See Lucas v. Hamm,* 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685, 688 (1961), *cert. denied,* 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962); Mallen & Smith, *supra,* § 7.9, at 376, § 7.11, at 382.

Thus, we forego application of a balancing test and attempt to provide more precise guidelines regarding the liability of a trustee's lawyer to a beneficiary. In pursuing this task we do not, however, start from scratch. We look to the body of law and commentary in New Mexico and other jurisdictions, much of which has developed by application of the balancing test.

In determining whether the lawyer for a fiduciary has a duty to oversee the fiduciary's conduct to ensure that the interests of the beneficiaries are protected, we find one consideration dispositive. That consideration is akin to the factor added to the balancing test by *Lucas v. Hamm:* whether recognition of such a duty "would impose an undue burden on the profession." 364 P.2d at 688. We restate the factor as: whether recognition of the duty would impose an undue burden on the lawyer-client relationship. *See* Mallen & Smith, *supra,* § 7.9, at 376 (stating that the "burden" issue raised in *Hamm* "has proved to be an important limitation of the expansion of duty where the consequences may be an impairment of independent judgment or an erosion of loyalty because an implied duty to another may create a conflict").

■ In our view it would place an intolerable burden on the lawyer-client relationship to hold that the lawyer for a trustee is liable to the beneficiary of the trust solely on the ground that the lawyer did not protect the beneficiary against misconduct by the trustee. There are, as we will later discuss, some particular circumstances in which the lawyer should be held liable to the beneficiary; but we reject the proposition that the liability can arise simply from the concatenation of the lawyer-client and trustee-beneficiary relationships.

The burden would be intolerable in several respects. To avoid liability, the lawyer would need to engage in activities not otherwise required by the lawyer-client relationship. The lawyer would need to look over the shoulder of the client-fiduciary in order to detect any defalcations for which the lawyer would be liable. This assumption of additional responsibilities would require additional lawyer time and effort. The cost of providing legal services to fiduciaries would increase substantially. This increase would be independent of whether malpractice premiums for trust lawyers increase. Because of the additional cost of legal services, funds available for distribution to beneficiaries would diminish. Thus, in order to provide a source of recovery to beneficiaries injured by defalcating trustees, beneficiaries who have honest trustees would suffer. Alternatively, trustees would be less likely to seek legal assistance, presumably to the detriment of beneficiaries, because lawyers had priced themselves out of the market.

■ Moreover, imposition of this added duty to a non-client would be likely to interfere with the desirable relationship of trust and confidence between a lawyer and client. If the lawyer must look over the client's shoulder to be sure the client is acting properly, then the relationship may well become strained. A client may not wish to retain a lawyer if the client has cause to believe that the lawyer does not trust the client. By requiring a lawyer to look over the client's shoulder, even without reasonable grounds to suspect that the client is engaging in misconduct, we would be making the lawyer take action that puts at risk the lawyer's retention by a perfectly honest client. Courts should be reluctant to impose duties on lawyers to

non-clients if they will interfere with the relationship of trust and confidence between lawyer and client that is otherwise nourished by the law. *See* SCRA 1986, 11–503 (lawyer-client privilege); *cf. Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 106 N.M. 757, 761, 750 P.2d 118, 122 (1988) (because ethics of the profession require "undivided loyalty" to the client, lawyer does not owe a duty of care to an opposing party in litigation).

Our refusal to impose the duty claimed by Leyba comports with the general rule governing agents of fiduciaries. One authority has stated the rule as follows:

> If a trustee in the administration of the trust employs an attorney or other agent, and the trustee commits a breach of trust, the agent is not under a liability to the beneficiaries of the trust for participation in the breach of trust, unless he knew or should have known that he was assisting the trustee to commit a breach of trust. Even if he knows or has reason to know that the trustee is committing a breach of trust, he is not liable unless he assists the trustee in such a way that he as well as the trustee should be held responsible for the breach of trust.

Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 326.4, at 310 (4th ed. 1989) (footnote omitted). The authors further state:

> If third persons knowingly participate with a fiduciary in a breach of his obligations, it is proper to hold them liable. It is quite a different matter, however, to compel them to supervise the conduct of the fiduciary and to hold them liable for failure to do so. A rule imposing such liability on them makes it dangerous to deal with a fiduciary and seriously interferes with the proper performance by the fiduciary of his duties.

*Id.* § 326.6, at 318–19.

Leyba has not brought to our attention, nor have we found, any reported decision imposing upon the lawyer for a trustee the broad duty she claims. *See Klancke v. Smith*, 829 P.2d 464 (Colo.Ct.App.1991) (lawyer, who represented widow in wrongful death action and complied with statute by distributing judgment proceeds to widow, owed no duty to other statutory beneficiaries to see that they received their share from widow), *cert. denied* (May 18, 1992). We perceive no reason to become the first court to do so. We reject the proposition that Whitley and Shapiro "owed [the Child] a legal duty to see to it that he received the settlement proceeds belonging to him."

### B. More Limited Duties

#### 1. Knowledge of Defalcation

That is not to say that under no circumstance can a lawyer for a trustee be held liable to a beneficiary of the trust. As already indicated in the quotation from *The Law of Trusts*, there is authority for the proposition that the lawyer for the trustee may be liable to the beneficiary if the lawyer knew or should have known of defalcations by the trustee. *See, e.g., Fickett v. Superior Court*, 27 Ariz.App. 793, 558 P.2d 988 (Ct. 1976) (guardian had embarked upon a scheme to misappropriate estate funds to his own use). Recognition of liability in such circumstances does not create the same problems that would arise if the lawyer had a duty to be sure that trust funds were properly distributed. Imposing liability only when misconduct by the fiduciary is clearly apparent avoids any need for the lawyer to look over the client's shoulder and hence avoids the resulting expense and the resulting damage to the lawyer-client relationship of confidence and trust. We should add, however, that even when the lawyer knows or should know of misconduct by the client-fiduciary, difficult questions emerge regarding what action the lawyer must take in response. Courts may be reluctant to require a lawyer to disclose confidential communications in order to halt or repair misconduct. *See generally* Robert F. Phelps, Jr., *Representing Trusts and Trustees—Who is the Client and Do Notions of Privity Protect the Client Relationship?*, 66 Conn.B.J. 211, 221 (1992); Geoffrey C. Hazard, Jr., *Triangular Lawyer Relationships: An Exploratory Analysis*, 1 Geo.J.Legal Ethics 15, 40–41 (1987); 62 U.S.L.W. 2734 (May 31, 1994) (summarizing American Law Institute discussion of proposed Restatement of the Law Governing Lawyers).

In any event, Leyba has not pressed on appeal a contention that the lawyers knew or should have known that Corrine would misappropriate or was misappropriating funds

held in trust. Thus, we reserve for another day a full description of this theory of liability.

### 2. Third–Party Beneficiary

A second well-recognized ground for imposing liability of a lawyer to a non-client, or at least a natural extension of that ground, does, however, require reversal of the summary judgments in favor of Whitley and Shapiro. Courts have recognized the liability of lawyers to non-clients who are third-party beneficiaries of a lawyer-client contractual relationship. *See* Mallen & Smith, *supra,* § 7.11, at 382, 384–86.

> The predominant inquiry . . . has generally involved one criterion: was the principal purpose of the attorney's retention to provide legal services for the benefit of the plaintiff? . . .
>
> Often the attorney's retention will benefit another. The inquiry, however, is whether the plaintiff was *the* person intended to be benefited by the legal services.

*Id.* at 384–85. *See Garcia,* 106 N.M. at 761, 750 P.2d at 122 (duty of care to non-clients has been recognized only when non-client was intended beneficiary of lawyer's services). Many of the leading cases holding a lawyer liable to a non-client can be described as third-party-beneficiary cases. The classic example arises when the lawyer preparing a will fails to exercise due care and thereby injures the intended beneficiary, a non-client. The beneficiary generally has a cause of action. *See, e.g., Lucas v. Hamm; Angel, Cohen & Rogovin v. Oberon Inv.,* 512 So.2d 192, 194 (Fla.1987); *cf. Jaramillo v. Hood,* 93 N.M. 433, 601 P.2d 66 (1979) (claim barred by statute of limitations).

It is not only in the will context that courts have recognized a cause of action of this type by a non-client. In *Pizel v. Zuspann,* 247 Kan. 54, 795 P.2d 42 *modified,* 247 Kan. 699, 803 P.2d 205 (1990), the decedent had intended to benefit certain of his children by establishing an inter vivos trust. Because of malpractice by the decedent's lawyer in inadequately advising the decedent of the steps necessary to effectuate the trust, the assets intended for the trust passed through the decedent's will. The court recognized a cause of action by the intended beneficiaries against the decedent's lawyer.

Likewise, in *Baer v. Broder,* 86 A.D.2d 881, 447 N.Y.S.2d 538 (1982), the personal representative of the estate of the decedent retained a lawyer to bring a wrongful death action. The court ruled that the statutory beneficiaries could sue the lawyer for malpractice in improperly reaching a settlement rather than pursuing litigation. *Cf. Wisdom v. Neal; Jenkins v. Wheeler,* 69 N.C.App. 140, 316 S.E.2d 354 (1974) (statutory beneficiary of wrongful-death action has cause of action against lawyer for personal representative of estate for failure to proceed with wrongful death action), *review denied,* 311 N.C. 758, 321 S.E.2d 136 (1984).

A common thread in these cases is that the non-client's cause of action is predicated on conduct by the lawyer that breached the lawyer's duty to the client. *See Franko v. Mitchell,* 158 Ariz. 391, 762 P.2d 1345, 1354 (Ct.App.1988). The lawyer was negligent in drafting the will, in giving advice regarding establishment of a trust or disbursement of the estate, or in litigating a claim. In none of these cases does recognition of liability of the lawyer to the non-client impact the lawyer-client relationship. Recognition of liability to the third party in these cases will not require lawyers to undertake any action that is not already required by their duties to their clients. For example, to prevent liability to the beneficiary of a will, a lawyer need only exercise due care in drafting the will, which is a duty already required by the lawyer's relationship with the testator. This is in clear contrast with what would happen if a lawyer had a duty to a beneficiary of a trust to ensure that trust proceeds were properly distributed. Imposition of that liability, as explained above, would require the lawyer to undertake additional responsibilities in overseeing the conduct of the client-trustee. Similarly, imposition of liability to the "third-party beneficiary" in the above cases does not strain the lawyer-client relationship by requiring the lawyer to do anything that would detract from the relationship of trust and confidence between lawyer and client.

To be sure, recognition of such claims by non-clients may have some economic impact on the lawyer-client relationship. The cost of drafting a will may increase if malpractice premiums rise because of potential liability of lawyers to testamentary beneficiaries. Nevertheless, it is unlikely that the client would object to this additional charge because imposition of liability both encourages due care by the lawyer in performing duties owed to the client and provides a back-up source for the third party to receive the bounty intended by the testator.

In applying this case law to the present appeal, we are influenced by Professor Melvin Eisenberg's analysis of the contract law of third-party beneficiaries. *See* Melvin A. Eisenberg, *Third–Party Beneficiaries*, 92 Colum.L.Rev. 1358 (1992) [hereinafter Eisenberg]. Eisenberg critiques the intent-to-benefit test generally adopted for determining whether one can recover as a third-party beneficiary to a contract. He points out that it would be contrary to normal principles of contract interpretation to look to the subjective intent of the promisee, *see id.* at 1381, yet if the test is objective, "[h]ow is it to be determined ... why in some contracts whose performance will benefit a third party, the benefit is objectively 'intended' within the meaning of the test, while in other contracts whose performance will benefit a third party, the benefit is not so 'intended'?" *Id.* at 1379.

Eisenberg avoids the difficulty by adopting what he terms the "third-party-beneficiary principle," which can account for the holdings in the great bulk of modern cases. One branch of the principle, the branch important for our purposes, permits the third-party beneficiary to enforce a contract if "allowing the beneficiary to enforce the contract is a necessary or important means of effectuating the contracting parties' performance objectives, as manifested in the contract read in the light of surrounding circumstances[.]" *Id.* at 1385.[1]

This branch of the third-party-beneficiary principle nicely explains the cases involving lawyer malpractice by revealing that the heart of the matter is the law of remedies, not the law of substantive duties. As Eisenberg writes:

> [U]nder the first branch of the third-party-beneficiary principle, the law of third-party beneficiaries is largely conceived as *remedial*, rather than substantive. The question addressed by the first branch of the principle is not whether the contract creates a "right" in the third party, but whether empowering the third party to enforce the contract is a necessary or important means of effectuating the contracting parties' performance objectives.

*Id.* at 1386. When a lawyer is liable to a non-client under the principle, it necessarily follows that (1) imposing liability does not expand the lawyer's duties to perform beyond those already required by the lawyer-client relationship and (2) imposition of liability should encourage proper performance by the lawyer of the duties owed the client. Eisenberg devotes a few paragraphs to explain how his principle supports the results in the "Would–Be Legatees" cases. *Id.* at 1393–96.

One virtue of Eisenberg's approach for our purposes is that it provides a useful starting point for determining the liability of a lawyer to a "third-party beneficiary" when the obligation of the lawyer that benefits the third party is an obligation imposed by public policy (tort law) rather than by contract. In other words, Eisenberg's analysis helps answer the question: If a lawyer's breach of a non-contractual duty to a client injures a third party, when should the third party be entitled to collect damages for the injury? The answer, a natural extension of contract principles, is that the third party should be

---

**1.** Eisenberg states the complete principle as follows:

> A third-party beneficiary should have power to enforce a contract if, but only if:
>
> (I) allowing the beneficiary to enforce the contract is a necessary or important means of effectuating the contracting parties' performance objectives, as manifested in the contract read in the light of surrounding circumstances; or
>
> (II) allowing the beneficiary to enforce the contract is supported by reasons of policy or morality independent of contract law and would not conflict with the contracting parties' performance objectives.

permitted to recover damages when "allowing the third party to enforce the duty is a necessary or important means of effectuating the policies underlying creation of the duty." Imposition of liability in such circumstances is appropriate because imposition of liability (1) advances the public policy underlying the lawyer's duty to the client and (2) does not undermine the lawyer-client relationship because it will not obligate the lawyer to engage in any conduct not already required by the lawyer's duty to the client.

## IV. APPLICATION TO PRESENT CASE

We now address the source of the liability of Whitley and Shapiro to the Child. That liability arises out of a duty owed by the lawyers to Corrine. The core duty of the lawyers was to conduct the wrongful-death litigation competently. But Leyba makes no complaint on that score. As litigators, Whitley and Shapiro are not challenged.

■■■ Competently conducting the litigation was not, however, the only duty they owed Corrine. They also owed her a duty to advise her of her status as a fiduciary. Although ordinarily one could assume that a trustee or other fiduciary is aware of that status without anyone specifically informing her, that assumption would not be appropriate here. Corrine was appointed as a personal representative for the purpose of bringing a wrongful death action. Lay people could well be unaware of the legal ramifications of that status. Nothing in the record suggests that Corrine had any special knowledge of such legal matters. Because of the potential consequences to Corrine herself if she misunderstood her responsibility with respect to the settlement proceeds, her lawyers had a duty to inform her of that responsibility. *See FDIC v. O'Melveny & Meyers,* 969 F.2d 744, 749 (9th Cir.1992) (lawyers had duty to client savings and loan to "guide [it] as to its obligations"), *rev'd,* —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) (directing appellate court to apply state law, rather than federal common law, on remand); Hazard, *supra,* at 40; *cf. Pizel,* 803 P.2d at 205–06 (duty to advise settlor of trust of the steps necessary to effectuate the trust).

■■■ Leyba alleges that Shapiro and Whitley did not inform Corrine of her fiduciary status and that the Child was injured thereby when Corrine appropriated the money to her own use rather than distributing it to the Child. Hence, the Child should have a cause of action against the lawyers for breach of that duty if recognizing the cause of action would be a necessary or important means of furthering the policy that imposed upon the lawyers the duty to advise Corrine of her fiduciary status. We think it would be.

If the Child (through Leyba) could not enforce the lawyers' duty to Corrine, then that duty could be vindicated only by a two-step procedure: the Child would sue Corrine and Corrine would then sue the lawyers for indemnity, contribution, or whatever, with the proceeds of that litigation funding any judgment against Corrine. Such a procedure, however, is unnecessarily complicated. *See* Eisenberg, *supra,* at 1392. Moreover, Corrine "would have had no economic incentive to enforce the [duty], because [she] would bear all the costs of enforcement while [the Child] would reap all the benefits." *Id.* at 1390. We note that a lawsuit by Leyba against the lawyers will not in itself disrupt an ongoing lawyer-client relationship between the lawyers and Corrine. *See id.* at 1404–05 (allowing owner to sue subcontractor as beneficiary of contract between solvent prime contractor and subcontractor may conflict with prime contractor's administration of its contracts with subcontractors).

In sum, we conclude that Whitley and Shapiro may be liable to the Child for failing to inform Corrine that she held the settlement proceeds solely for the benefit of the Child.

■■■ Of course, the lawyers are liable only if they failed to perform this duty. They argue on appeal that they were entitled to summary judgment because the record compels the conclusion that they in fact advised Corrine that the settlement proceeds were to be held for the benefit of the Child. They contend that Corrine's testimony to the contrary is simply not credible. Although they refer to a great deal of evidence that could convince a jury of their contention, this Court cannot afford them the relief they

seek. Corrine's testimony did not contradict any law of nature or other uncontrovertible fact of which we could take judicial notice. *See Ortega v. Koury,* 55 N.M. 142, 144, 227 P.2d 941, 942–43 (1951) (when physical facts and conditions leave no room for a contrary conclusion, sworn testimony to the contrary is not substantial evidence); *Luchetti v. Bandler,* 108 N.M. 682, 686, 777 P.2d 1326, 1330 (Ct.App.), *cert. denied,* 108 N.M. 681, 777 P.2d 1325 (1989). Moreover, the provisions of the mobile-home purchase contract that Whitley drafted support Corrine's testimony; a fact finder could disbelieve Whitley's explanation of those provisions. Matters of credibility are for the jury to decide; they are not to be decided on motions for summary judgment. *See Security Bank & Trust v. Parmer,* 97 N.M. 108, 111, 637 P.2d 539, 542 (1981). Therefore, we must reverse the summary judgment and remand for further proceedings.

## V.  CONCLUSION

The district court properly granted the lawyers' motion for summary judgment to the extent that Leyba claims that the lawyers violated a duty to distribute the settlement proceeds to a conservator for the Child or to oversee the distribution of funds by Corrine. Summary judgment was improper, however, because there is a genuine issue of material fact regarding the lawyers' potential liability to the Child predicated on their failure to inform Corrine of her status as a fiduciary. We remand for further proceedings consistent with this opinion.

IT IS SO ORDERED.

PICKARD and FLORES, JJ., concur.